UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Hanfi Marlow Jihad,

       Plaintiff,

vs.                                             REPORT AND RECOMMENDATION

Commissioner Joan Fabian,
Assistant Commissioner David Crist,
MCF-Stillwater Warden John King,
Assoc. Warden Eddie Miles,
Program Director Bruce Julson,
Program Director David Reishus,
Religious Cord. Gregory Skrypek,
Chaplain Norris Blackmon,
and Assoc. Warden Michelle Smith,

       Defendants.          Civ. No. 09-1604 (DSD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I. Introduction

This matter came before the undersigned United States Magistrate Judge

pursuant to a general assignment, made in accordance with the provisions of Title 28

U.S.C. §636(b)(1)(B), upon the Motion of the Plaintiff for a Temporary Restraining

Order, or a Preliminary Injunction. For these purposes, the Plaintiff appears pro se,

and the Defendants Joan Fabian and Michelle Smith appear by Angela Behrens,

Assistant Minnesota Attorney General. The remaining Defendants, who were only recently served, have not yet made an appearance. For reasons which follow, we recommend that the Plaintiff's Motion for a Temporary Restraining Order, or a Preliminary Injunction, be denied.

## II. Factual and Procedural Background[1]

The Plaintiff, who is a Minnesota State prisoner, commenced this action under Title 42 U.S.C. §1983, alleging that the Defendants have violated his rights under the First Amendment, the Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), see, Title 42 U.S.C. §2000cc, et al., and the Minnesota Constitution, during his incarceration at the Minnesota Correctional Facility, in Stillwater ("MCF-Stillwater"), which is a Level 4 Facility. Specifically, the Plaintiff contends that Minnesota Department of Corrections ("DOC") Directive 302.300 ("Directive 302.300") is unconstitutional as applied to him, because it

---

[1]In support of his Motion, the Plaintiff has submitted his own Affidavit, the Affidavits of several other inmates at MCF-Stillwater, and Exhibits with his Complaint, and Amended Complaint. In addition, the Defendant has asserted multiple factual allegations in his Memoranda in Support. The Defendants have submitted several Affidavits of personnel with the Minnesota Department of Corrections ("DOC"). We consider all of these Affidavits, and Exhibits, to be the Record for purposes of this Motion, but note that we do not consider the Affidavits submitted in connection with later Motions, as they are irrelevant to the issues now before us.

infringes upon his ability to practice his religion -- Islam -- by prohibiting him from

wearing his Kufi (prayer cap),and his Islamic medallion outside of his clothing, and

outside of his cell or religious services; by failing to provide him with Islamic Halal

meals; by failing to provide him with a location which does not contain a toilet where

he may perform his five (5) daily salat (prayers); by prohibiting religious meetings

without a volunteer present; and by failing to hire a Muslim Chaplain.   See,

Complaint, Docket No. 1, at p. 5;[2] Plaintiff's Motion for Temporary Restraining Order

("Plaintiff's Motion"), Docket No. 4, at pp. 1-2 of 10.  As a result of those alleged

violations, the Plaintiff is seeking an Order that directs MCF-Stillwater to take a

variety of actions, in order to facilitate the Plaintiff's religious practice.  Plaintiff's

Motion, supra at pp. 5-6.

       As reflected in the Plaintiff's Affidavit, which was submitted with his Motion,

see, Docket No. 4, at pp. 7-10 of 10, and the Affidavit of Kim Ebeling ("Ebeling"),

---

       [2]The Plaintiff filed an Amended Complaint on August 3, 2009, see Docket No.
11.   While we note the Local Rule 15.1 prohibits amended pleadings from
incorporating previous pleadings by reference, we read the Plaintiff's pleadings
liberally, as he acts pro se.  See, Davis v. Hall, 992 F.2d 151, 152 (8th Cir.
1993)("Civil rights pleadings are construed liberally."); Estelle v. Gamble, 429 U.S.
97, 106 (1976).  The Amended Pleading clearly intends to incorporate the claims
alleged in the original Complaint, and so, we read the two pleadings together for
purposes of the instant Motion.

see, <u>Docket No. 34</u>, at ¶5, the Plaintiff filed a formal grievance, No. 3725, in relation to his requests to be allowed to perform his five (5) daily salat in a space free from a toilet, to be provided three (3) Islamic Halal diet meals a day, (4) to be allowed to have prayer meetings without a volunteer, and (5) to be allowed to wear his Islamic medallion outside of his clothing and his Kufi cap when outside his cell.

The Plaintiff contends that he mailed copies of his grievances and responses to Joan Fabian ("Fabian"), who is the Commissioner of the Minnesota DOC, on November 10, 2008. See, <u>Plaintiff's Aff.</u>, <u>Docket No. 4</u>, at p. 9 of 10. Thereafter, on December 10, 2008, the Plaintiff received a response from Krista Fink ("Fink"), who is an associate legal counsel for the Minnesota DOC, and who informed the Plaintiff that she was responding on Fabian's behalf. <u>Id.</u> The Plaintiff alleges that Fink did not address the claims that were raised in his grievances, but instead, told him that he should follow the grievance process, and that he should seek out legal counsel. <u>Id.</u>

On December 12, 2008, the Plaintiff sent a grievance to MCF-Stillwater Warden John King ("King"), in which he contended that his rights pursuant to the RLUIPA, and to the Minnesota State Constitution, were being violated. <u>Id.</u> at pp. 9-10 of 10. On December 19, 2008, King denied the Plaintiff's grievance. <u>Id.</u> The Plaintiff contends that, on December 23, 2008, he filed a grievance with Ebeling, in

order to appeal King's decision, and that Assistant Commissioner David Crist ("Crist") denied his grievance. Id. at p. 10. The Plaintiff then filed a "Collateral Review" with Fabian, on January 19, 2009, to which Fink responded that the issues had already been addressed. Id.

On December 27, 2008, the Plaintiff asked David Reishus ("Reishus"), who is a Program Director at MCF-Stillwater, to speak with Bill Deike ("Deike"), who is the Kitchen Supervisor at MCF-Stillwater, about providing Halal meals.[3] Id. The Plaintiff alleges that Reishus intervened before the Plaintiff spoke with Deike, and denied his request for Halal meals, and suggesting that the Plaintiff "shop around the tray for his Halal food to satisfy his religious diet." Id.

On June 29, 2009, Michelle Smith ("Smith"), who is the Associate Warden of Operations at MCF-Stillwater, released a memorandum to inform the prison population that, in observance of the Fourth of July holiday, the prison would have to cancel the Friday Jumu'ah (Islamic religious meeting), but that other institutional programming, including education, recreational, and sporting events, would proceed as scheduled. Plaintiff's Reply, Docket No.38, at p. 7 of 13. The Plaintiff contends

---

[3]The Plaintiff maintains that he originally made a request for Halal meals to King, but was directed to file his request with Deike. See, Amended Complaint, supra at p. 6.

that this is one of many instances where a secular or Christian holiday was favored over Islamic religious services or holidays.  <u>Id.</u> at p. 8 of 13.

MCF-Stillwater requires all religious groups to have a volunteer to supervise the services.  See, <u>Norris Blackmon Affidavit ("Blackmon Aff.")</u>, <u>Docket No. 32</u>, at ¶6; <u>Bruce Julson Affidavit ("Julson Aff.")</u>, <u>Docket No. 33</u>, at ¶7.  The Plaintiff also contends that this policy substantially burdens his ability to practice his religion.  See, <u>Plaintiff's Motion</u>, at p. 2 of 10.  The Plaintiff submitted the Affidavits of two (2) inmates, who attest that Jumu'ah has been cancelled several times because no volunteer arrived to supervise.  See, <u>Larry Clark Affidavit</u>, <u>Docket No. 24</u>; <u>Shane Jabbaar Pierson Affidavit</u>, <u>Docket No. 26</u>.  The Plaintiff requests that Jumu'ah be supervised by staff only, so that it will not be cancelled for lack of a volunteer. <u>Plaintiff's Reply</u>, <u>Docket No. 11</u>, at p. 6 of 13.

### III.  <u>Discussion</u>

A.  <u>The Plaintiff's Motion for a Temporary Restraining Order, or a Preliminary Injunction</u>.

As noted, the Plaintiff requests a Temporary Restraining Order which would direct MCF-Stillwater to facilitate his religious practice through a variety of means.  See, <u>Plaintiff's Motion</u>, supra at pp. 5-6.  However, since the Defendants have

received notice of the Plaintiff's request for relief, and have filed a response to his request, we construe the Plaintiff's request as a Motion for a Preliminary Injunction. See, <u>Walarath v. United States</u>, 830 F. Supp. 444, 445 (N.D. Ill. 1993), citing, <u>Levas and Levas v. Village of Antioch</u>, 684 F.2d 446, 448 (7th Cir. 1982); <u>Akbar v. Borgen</u>, 796 F. Supp. 1181, 1185 (E.D. Wis. 1992)(citing same).

The Courts have listed the critical showings for a Preliminary Injunction as follows:

      1)      irreparable injury to the movant;

      2)      the balance between the injury and the harm that the preliminary injunction will cause to the other parties;

      3)      the movant's probability of success on the merits; and

      4)      the public interest.

<u>Vonage Holdings Corp. v. Nebraska Public Service Commission</u>, 564 F.3d 900, 904 (8th Cir. 2009), quoting <u>Dataphase Systems, Inc. v. C L Systems, Inc.</u>, 640 F.2d 109, 114 (8th Cir. 1981); <u>Stuart Hall Co.,Inc. v. Ampad Corp.</u>, 51 F.3d 780, 783 n. 2 (8th Cir. 1995), citing <u>Calvin Klein Cosmetics Corp. v. Lenox Lab.</u>, 815 F.2d 500, 503 (8th Cir. 1987); see also, <u>Roberts v. Van Buren Public Schools</u>, 731 F.2d 523, 526 (8th Cir. 1984); <u>Ferry-Morse Seed Co. v. Food Corn, Inc.</u>, 729 F.2d 589, 592 (8th Cir. 1984).

"A preliminary injunction is an extraordinary remedy, see Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987), and the burden of establishing the propriety of an injunction is on the movant." <u>Watkins, Inc. v. Lewis,</u>

346 F.3d 841, 844 (8th Cir. 2003), citing <u>Goff v. Harper</u>, 60 F.3d 518, 520 (8th Cir. 1995).  "No single factor in itself is dispositive; rather, each factor must be considered to determine whether the balance of equities weighs toward granting the injunction." <u>United Industries Corp. v. Clorox Co.</u>, 140 F.3d 1175, 1179 (8th Cir. 1998), citing <u>Sanborn Mfg. Co., Inc. v. Campbell Hausfield/Scott Fetzer Co.</u>, 997 F.2d 484, 486 (8th Cir. 1993), and <u>Calvin Klein Cosmetics Corp. v. Lenox Lab., Inc.</u>, supra at 503.

When seeking a Preliminary Injunction, the burden on the movant "'is a heavy one where, as here, granting the preliminary injunction will give [the movant] substantially the relief [he] would obtain after a trial on the merits.'" <u>Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.</u>, supra at 486, quoting <u>Dakota Indus., Inc. v. Ever Best Ltd.</u>, 944 F.2d 438, 440 (8th Cir. 1991).

"Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." <u>Watkins Inc., v. Lewis</u>, supra at 844, citing <u>Adam-Mellang v. Apartment Search, Inc.</u>, 96 F.3d 297, 299 (8th Cir. 1996).  "When there is an adequate remedy at law, a preliminary injunction is not appropriate." <u>Id.</u>, citing <u>Modern Computer Sys., Inc. v. Modern Banking Sys., Inc.</u>, 871 F.2d 734, 738 (8th Cir. 1989).  In addition, "an injunction cannot issue if there is no chance of success on the merits[.]" <u>Mid-America Real Estate Co. v. Iowa Realty Co.</u>, 406 F.3d

969, 972 (8th Cir. 2005), citing <u>Firefighters Local Union No. 1784 v. Stotts</u>, 457 U.S. 561, 589 (1984)(O'Connor, J., concurring), and <u>AM General Corp. v. DaimlerChryler Corp.</u>, 311 F.3d 796, 804 (7th Cir. 2002).

"In the context of First Amendment cases, courts normally assume irreparable injury because '[t]he loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury.'" <u>Wickersham v. City of Columbia, Missouri</u>, 371 F. Supp.2d 1061, 1075 (W. D. Mo. 2005), quoting <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976). However, "[u]nder the Eighth Circuit's interpretation of <u>Elrod</u>, irreparable harm exists '[i]f [the plaintiffs] **are correct and their First Amendment rights have been violated.**'" <u>Education Minnesota Lakeville v. Independent School District No. 194</u>, 341 F. Supp.2d 1070, 1080 (D. Minn. 2004)[emphasis in original], quoting <u>Marcus v. Iowa Public Television</u>, 97 F.3d 1137, 1140-41 (8th Cir. 1996). Accordingly, in determining whether irreparable harm has been established, and whether a preliminary injunction is warranted, we focus our attention on the likelihood that the Plaintiff will succeed on the merits of his First Amendment claim. See, <u>Wickersham v. City of Columbia, Missouri</u>, supra at 1075 ("[B]ecause of the inherent public interest in free speech and the threat of irreparable injury if speech is suppressed, courts rarely focus on the three latter <u>Dataphase</u> factors; instead they look

primarily to whether the party seeking the preliminary injunction is likely to succeed on the merits.").

        1.    <u>The Probability that the Plaintiff Will Succeed on the Merits</u>.  The Plaintiff contends that his rights under the RLUIPA, the First and Fourteenth Amendments, and the Minnesota Constitution, have been violated by Directive 302.300, and the various policies which, he contends, have substantially burdened his religious exercise.  The Defendants respond that the Plaintiff's claims are without merit.  Given that the RLUIPA, and the First Amendment, require the same showing of "substantial burden," but that the RLUIPA holds the Government to a higher standard in justifying those burdens on prisoners, we first consider the Plaintiff's claims under that Statute.  See, <u>Gladson v. Iowa Dept of Corr.</u>, 551 F.3d 825, 833 (8th Cir. 2009); <u>Patel v. U.S. Bureau of Prisons</u>, 515 F.3d 807, 813 (8th Cir. 2008); <u>Weir v. Nix</u>, 114 F.3d 817, 820 (8th Cir. 1997)(discussing Religious Freedom Restoration Act of 1993 ("RFRA")).

        a.    <u>The Plaintiff's RLUIPA Claims</u>.

        1)    <u>Standard of Review</u>.  In addition to the prison inmates' rights under the First Amendment, "Congress enacted RLUIPA to provide additional protection for institutionalized persons' religious freedom."  <u>Singson v.</u>

Norris, 553 F.3d 660, 662 (8th Cir. 2009), citing RLUIPA, Title 42 U.S.C. §2000cc

and Fegans v. Norris, 537 F.3d 897, 902 (8th Cir. 2008); see also, Brown ex. rel.

Indigenous Inmates at North Dakota State Prison v. Schuetzle, 368 F. Supp.2d 1009,

1019 (D. N.D. 2005)("'By enacting RLUIPA, Congress established a statutory free

exercise claim encompassing a higher standard of review than that which applies to

a constitutional free exercise claim.'"), quoting Murphy v. Missouri Dep't of

Corrections, 372 F.3d 979, 986  (8th Cir. 2004), cert. denied 543 U.S. 991 (2004).

Specifically, the RLUIPA provides as follows:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person --
>
> (1)    is in furtherance of a compelling governmental interest; and
>
> (2)    is the least restrictive means of furthering that compelling governmental interest.

Title 42 U.S.C. §2000cc-1(a).

The RLUIPA contains language similar to RFRA.  Our Court of Appeals has

concluded that, in passing the RLUIPA, "'Congress did not intend to overly burden

prison operations, but rather intended to provide as much protection as possible to

prisoners' religious rights without undermining the security, discipline, and order of those institutions.'" <u>Fowler v. Crawford</u>, 534 F.3d 931, 937 (8th Cir. 2008), cert. denied, --- U.S. ---, 129 S.Ct. 1585 (2009), quoting <u>Murphy v. Missouri Dep't Corrections</u>, supra at 987; see also, <u>Gladson v. Iowa Dep't of Corrections</u>, supra at 832.

Accordingly, the Plaintiff must demonstrate that the Defendants' policies, and actions, constitute a substantial burden on his ability to practice his religion. In order to demonstrate a substantial burden, the Plaintiff must show that the policies or actions "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." <u>Murphy v. Missouri Dept. of Corr.</u>, supra at 988, quoting <u>Weir v. Nix</u>, supra at 820; see also, <u>Gladson v. Iowa Dep't of Corrections</u>, supra at 832; <u>Patel v. United States Bureau of Prisons</u>, supra at 813, quoting <u>Murphy v. Missouri Dep't of Corrections</u>, supra at 988.

Recently, the Eighth Circuit has somewhat altered that definition, in order to include the RLUIPA's "broad protection of 'religious exercise,'" which "extends even

- 12 -

to religious practices that are not 'compelled by, or central to' a certain belief system."

See, <u>Van Wyhe v. Reisch</u>, 581 F.3d 639, 656 (8th Cir. 2009), citing <u>Patel v. United States Bureau of Prisons</u>, supra at 813 n. 7. Accordingly, we do not inquire as to "whether a particular belief or practice is 'central' to a prisoner's religion."[4] <u>Id.</u>, quoting <u>Gladson v. Iowa Dept. of Corr.</u>, supra at 832, citing, in turn, <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 725 n. 13 (2005). However, while we do not demand that the Plaintiff show the doctrinal import of a religious practice, he must still show that his religious exercise is substantially burdened. <u>Id.</u> at 657, citing <u>Gladson v. Iowa Dept. of Corr.</u>, supra at 833. Once the Plaintiff has made a prima facie showing that his rights have been violated under the RLUIPA, the Government bears the burden of persuasion as to any element of the claim except the existence of a substantial burden. See, <u>Title 42 U.S.C. 2000cc-2(b)</u>.

2)     <u>Legal Analysis</u>. Directive 302.300 was promulgated pursuant to Minnesota Statutes Section 241.05, which states, in relevant part, as follows:

---

[4]We also do not inquire into the sincerity of the Plaintiff's beliefs, as the Defendants do not dispute that point. See, <u>Defendant's Memorandum in Opposition ("Defendants' Opp.")</u>, <u>Docket No. 29</u>, at p. 13.

> The Commissioner of corrections shall allow inmates of all prisons under the commissioner's control to participate in religious activities, during which members of the clergy of good standing in any church or denomination may freely administer and impart religious rites and instruction to those desiring them.

Minnesota Statutes Section 241.05.

The Plaintiff contends that the Directive violates his rights in a number of ways. For the sake of simplicity, and clarity, we consider separately the Plaintiff's claims with respect to the location, supervision, and duration of his prayer services; his ability to wear a Kufi, and an Islamic medallion outside his clothing; and the service of Halal meals, and religious special foods.

a)      Prayer and Worship Services.

The Plaintiff argues that the Defendants' failure to hire a Muslim Chaplain is a substantial burden on his religious practice. We disagree. First Amendment jurisprudence is clear that prisoners do not have a constitutional right to a unique religious leader for each sect in the prison. See, Blair-Bey v. Nix, 963 F.2d 162, 163 (8th Cir. 1992), cert. denied, 506 U.S. 1007 (1992); Weir v. Nix, supra at 820; Runningbird v. Weber, 198 Fed.Appx. 576, 578 (8th Cir. 2006); Brown ex rel. Indigenous Inmates at North Dakota State Prison v. Schuetzle, supra at 1020-21. The Plaintiff does not allege that his only opportunity for group

worship is under guidance which contradicts his religious beliefs, nor does he allege that his practice is inhibited. See, <u>Weir v. Nix</u>, supra at 821; <u>El Izquierdo v. Crawford</u>, 2007 WL 2873210 at * 5 (E.D. Mo., September 26, 2007). Accordingly, we find that the Plaintiff is not likely to succeed on the merits of that claim, as he has not demonstrated a substantial burden on his religious practice.

The Plaintiff also alleges that the requirement, that a volunteer be present at all religious meetings, and the resulting occasional cancellation of Jumu'ah, violates the RLUIPA.[5] We find that the Plaintiff's claim is not likely to succeed on the merits, as he has not shown a substantial burden on his religious practice. In his supporting materials, the Plaintiff alleges that Jumu'ah was cancelled four (4) times, see, <u>Docket No. 1-4</u>, Exhibit Nos. 28, 34, 38 and 39, at pp. 13-14, 18, and 19 of 19, and that

---

[5]In his informal and formal Grievances on that subject, the Plaintiff contends that Directive 302.300 does not require a volunteer to be present at religious meetings, and that the officials misinterpret that Regulation. However, the Directive states that "[r]eligious resource volunteers must be present to provide supervision and/or leadership for all scheduled religious activities in level 4 and 5 facilities," and MCF-Stillwater is a Level 4 Facility. See, <u>Norris Blackmon Affidavit ("Blackmon Aff.")</u>, <u>Docket No. 32</u>, at ¶6.

Sunday services were cancelled eight (8) times, id, Exhibit Nos. 30-33, 35, 38 and 39, at pp. 13-15, 18, and 19 of 19, over a period of nine (9) months, for lack of volunteer.[6]

The Plaintiff has not alleged that group services are prohibited, and a number of Courts have found that cancellation, due to a lack of volunteers, is not a substantial burden where the policy is applied uniformly. See, Anderson v. Harron, 2009 WL 2058863 at *5 (D. N.J. July 7, 2009); Smith v. Kyler, 295 Fed.Appx. 479, 483 (3rd Cir. 2008), cert. denied --- U.S. ---, 129 S.Ct. 2837 (2009); Adkins v. Kaspar, 393 F.3d 559, 571 (5th Cir. 2004)(no substantial burden where volunteers available); cf., Mayfield v. Texas Dept. of Criminal Justice, 529 F.3d 599, 613 (5th Cir. 2008) (vacating Summary Judgment, because issues of material fact existed as to how often a volunteer was available); Newby v. Quarterman, 325 Fed.Appx. 345, 350-51 (5th Cir. 2009)(reversing dismissal of the RLUIPA claim on outside-volunteer policy, where no Buddhist volunteers had been approved to lead meetings).

Moreover, even though group services may occasionally be cancelled, the Plaintiff has other opportunities for group worship during the week. See, Blackmon

---

[6]We note that the Plaintiff has submitted the Affidavit of Shane Jabbaar Pierson, who asserts that Jumu'ah is "continually" cancelled, see, Docket No. 26, at ¶5. Such a vague statement, however, is insufficient to show that the services are cancelled more frequently than the Plaintiff's other Exhibits demonstrate.

Aff., supra at ¶5; <u>Affidavit of Joseph Hobson ("Hobson Aff.")</u>, <u>Docket No. 35</u>, at ¶4.[7]

Those opportunities include: two (2) Jumu'ah services every Friday; a Taslm, which is a study group, offered every Sunday; and every Tuesday and Thursday additional Islamic services are offered. See, <u>Blackmon Aff.</u>, supra at ¶5; <u>Hobson Aff.</u>, supra at ¶4. While the Plaintiff disputes the number of opportunities, and asserts that Muslim inmates only have two (2) services during each week, we find that this affords him reasonable opportunities to practice his faith, such that the occasional cancellation is not a substantial burden. See, <u>Harris v. Moore</u>, 2009 WL 3297167 at *1 (8th Cir. 2009)(the plaintiff's allegation, that prison officials limited the number of religious services he could attend, did not constitute a substantial burden).[8]

---

[7]There is a discrepancy between those two Affidavits regarding the number of group services that are available. Blackmon attests that Muslim inmates have a total of six (6) opportunities to meet each week, and Hobson avers four (4). See, <u>Blackmon Aff.</u>, supra at ¶5; <u>Hobson Aff.</u>, supra at ¶4. Irrespective of that discrepancy, and the Plaintiff's disagreement, the fact remains that all agree that there is more than one (1) opportunity per week for group services.

[8]Even if the Plaintiff had shown a substantial burden on his religious exercise, his claim would likely fail, because the Defendants' compelling interests, and their implementation of the least restrictive means of furthering those interests, most likely would justify the Regulation. The Defendants contend that the volunteer is necessary in order to prevent the placement of inmates in supervisory positions over other inmates, or in creating hierarchies, which, in turn, prevents potential conflicts. <u>Defendants' Opp.</u>, supra at p. 16. Courts have recognized a prison's policy interest

(continued...)

As to the Plaintiff's claims regarding his salat, or five (5) daily prayers, we find,

in contrast, that the restrictions, in all likelihood, impose a substantial burden on the

Plaintiff's religious practice.  In so finding, we are mindful of the fact that, where a

---

in prohibiting unsupervised group activity, or the creation of leadership roles within a religion, in order to maintain prison security and discipline.  See, <u>Shabazz v. Arkansas Dept. of Corr.</u>, 157 Fed.Appx. 944, 945 and 946 (8th Cir. 2005)(affirming District Court's holding that avoiding the elevation of one (1) inmate to a position of religious leadership furthers prison security); <u>Cooper v. Tard</u>, 855 F.2d 125, 129 (8th Cir. 1988)(policy which prohibited a Muslim group from creating a distinct leadership structure, and conducting unsupervised religious services, was reasonably related to a legitimate government interest); <u>Akbar v. Borgen</u>, 796 F. Supp. 1181, 1187 (E.D. Wis. 1992)(recognizing that "preventing gang activity and maintaining order in the prison population" were legitimate penological goals); <u>Tisdale v. Dobbs</u>, 807 F.2d 734, 738 (8th Cir. 1986)(unsupervised group meetings posed danger of "becoming forums for dissension and unrest"); cf., <u>Lee v. Gurney</u>, 2009 WL 3109850 at *6-*7 (E.D. Va., September 25, 2009)(denying Summary Judgment where the defendants had failed to show that no material facts existed as to the compelling interest of security).

While the Plaintiff asserts that inmates currently lead Islamic prayers and teach classes, see, <u>Plaintiff's Reply</u>, <u>Docket No. 11</u>, at p. 11 of 13, that assertion is plainly contradicted by the Directive's requirements, and the Defendants' practice of cancelling services when no volunteer is present, and therefore, the Plaintiff has not made the strong showing on the merits so as to warrant preliminary injunction.  Of course, it is important to note that, in deciding this issue, we have not considered Blackmon's attestation that, in his experience, Muslim prisoners are more likely to be involved in gang activity.  See, <u>Blackmon Aff.</u>, supra at ¶3.  We find that statement to be conclusory, and irrelevant, as the volunteer requirement applies to meetings of all faiths at MCF-Stillwater, and the Plaintiff does not request fully unsupervised meetings.

prisoner has sufficient alternative opportunities for worship, his religious exercise is not substantially burdened.  See, Murphy v. Missouri Dept. of Corr., supra at 983 ("A prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so."), citing Hammons v. Saffle, 348 F.3d 1250, 1256 (10th Cir. 2003).  We are also mindful that some District Courts, in other Districts, have found that a prisoner's ability to pray in his cell is an adequate alternative to group prayer.  See, McRoy v. Cook County Dept. of Corrections, 366 F. Supp.2d 662, 676 (N.D. Ill. 2005), aff'd, 205 Fed.Appx. 462 (7th Cir. 2006), cert. denied, 552 U.S. 1027 (2007); Akbar v. Borgen, supra at 1187 (recognizing individual prayer as an appropriate alternative means for a Muslim prisoner to express his religion); Anderson v. Harron, supra at *5; Ahmad v. Ehrmann, 339 F. Supp.2d 1134, 1138 (D. Colo. 2004)(in First Amendment analysis, weekly group prayer was a sufficient substitute for daily prayer in a room without a toilet), reversed on other grounds, 435 F.3d 1196 (10th Cir. 2006).  We find that those cases to be distinguishable for, here, the Plaintiff has likely demonstrated sufficiently that the

alternative -- namely, prayer within his cell -- is unacceptable for sincerely-held religious reasons.[9]

In particular, the Plaintiff contends that his sincerely held religious beliefs prohibit him from praying in a room with a toilet, see, Plaintiff's Reply, supra at p. 2 of 13, and also require him to pray five (5) times per day, see, Plaintiff's Memorandum in Support of the Complaint, Docket No. 2, at p. 21 of 34. Those assertions demonstrate the religious nature of his requests, and that the Defendants' refusal to allow him to pray somewhere, other than his cell, requires him to either forego the salat, or pray in a manner which violates his religious tenets. See, Plaintiff's Reply, supra at p. 12 of 13. We find that such a requirement significantly inhibits his religious conduct. See, Van Wyhe v. Reisch, supra at 656 (upholding denial of Summary Judgment on substantial burden prong, where the plaintiff alleged the religious significance of the practice, and that the denial significantly inhibited, constrained, or altered, the expression of his faith).

------------------------

[9]We also note the distinction between the facts here, and those in Van Wyhe v. Reisch, 581 F.3d 639, 656-57 (8th Cir. 2009), where the Court held that the alleged inadequacy of three (3) hours of group worship time afforded did not demonstrate a substantial burden under the RLUIPA, since the plaintiff had the opportunity to study in his cell as well. Here, as to his salat, the Plaintiff argues that the Regulations require him to act in contradiction to his religious beliefs -- either by not praying, or by praying near a toilet -- and not just that the allowances are inadequate.

Having found that the Plaintiff has likely demonstrated a substantial burden on his religious exercise, as to his salat, we next address the Government's justifications. At this step, we find that the Plaintiff is not likely to succeed on his claim, as the Defendants have demonstrated a compelling justification for that burden, based upon prison safety and security. See, Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004) (security is "the most compelling government interest in a prison setting"), quoting Ochs v. Thalacker, 90 F.3d 296, 296 (8th Cir. 1996); Fegans v. Norris, supra at 902 ("The Supreme Court has remarked that 'context matters' in the application of this 'compelling governmental interest' standard, and that the RLUIPA does not 'elevate accommodation of religious observances over an institution's need to maintain order and safety."), citing Cutter v. Wilkinson, supra at 722; see also, Fowler v. Crawford, at 939 ("A prison's interest in order and security is always compelling.").

Specifically, the Defendants contend that the chapel space is limited, and allowing the Plaintiff, and other Muslims, to use the chapel five (5) times a day would limit the time that other religions could use the chapel, see, Julson Aff., supra at ¶10, which could potentially lead to conflicts among prisoners, due to a perception of favoritism. Id. Moreover, the safety of both prison staff, and inmates, would be at risk because of the logistic difficulties in keeping track of the prisoners as they travel

to, and from, the chapel five (5) times a day.  Id.  While the Plaintiff counters that he is simply requesting salat in a place without a toilet, and not in the chapel specifically, the fact still remains that prison officials would be required to track, and monitor, up to one hundred forty (140) people moving from their cells, which all contain toilets, five (5) more times per day, per prisoner.

Such a significantly increased movement of prisoners plainly implicates the Defendants' overriding, and compelling interest, in prison safety and security, and no other, less restrictive means is available, since allowing the prisoners to move from their cells more frequently, during the day, imposes the same risks no matter to which area of the prison they should travel.  See, Vega v. Lantz, 2009 WL 3157586 at *10 (D. Conn., September 25, 2009)("RLUIPA does not require officials to make the burdensome alterations to prison scheduling" that the plaintiff sought to congregate for prayers five (5) times daily, "particularly in light of the security concerns that the defendants identify," in perceptions of favoritism, interference with daily operations, and denying others the use of common rooms and other areas); Jackson v. McBride, 2007 WL 2815447 at *8 (S.D. W.Va. September 25, 2007)(prohibition of daily outdoor group prayers was not a substantial burden, and justified by compelling

interest in security).  Accordingly, we find that the Plaintiff is not likely to succeed on the merits of that claim under the RLUIPA.[10]

                                  b)      <u>Religious Garments</u>.

Construing his submissions liberally, the Plaintiff contends that the Defendants have placed a substantial burden on his religious exercise by prohibiting him from wearing a Kufi in the prison yard, and requiring him to conceal his religious medallion under his clothing, which prevents him from expressing his Islamic identity.  See, <u>Plaintiff's Motion</u>, supra at ¶11.  The Defendants respond that prohibiting unique garments outside of cells or services, such as religious headgear, and requiring necklaces to be worn under clothing, promotes uniformity of appearance, which prevents conflicts among inmates, and reduces the opportunity for prisoners to demonstrate gang affiliations.  See, <u>Blackmon Aff.</u>, supra a ¶10; <u>Julson Aff.</u>, supra at ¶12.  In his Reply, the Plaintiff questions the Defendants' sincerity, and contends that allowing religious headgear would not cause more of a

---

[10]The Exhibits, that the Plaintiff has submitted, reveal that there was previously an Islamic group evening prayer, which was cancelled because of the volunteer requirement.  See, <u>Docket 1-2</u>, Exhibit No. 5, at p. 11 of 24; <u>Abdullahtalib J.B. Mansoor Affidavit</u>, <u>Docket No. 18</u>, at p. 1 of 1; <u>Larry Larue Clark Affidavit</u>, <u>Docket No. 24</u>, at ¶5.  The cancellation is also unlikely to be found to constitute a substantial burden, as weekly group services are available.  See, <u>Weir v. Nix</u>, 114 F.3d 817, 821 (8th Cir. 1997); <u>Van Wyhe v. Reisch</u>, supra at 657.

gang problem than already exists at MCF-Stillwater. See, <u>Plaintiff's Reply</u>, supra at pp. 4-5, and 7 of 13.

The Minnesota DOC has promulgated Directive 303.020, which prohibits wearing religious headgear except in cells, and at authorized religious services, in order to promote uniformity of clothing and prevent disturbances. See, <u>Julson Aff</u>, at ¶¶11-12; <u>Docket No. 33-1</u> at p. 7 of 9. Only state-issued baseball caps, stocking caps, and sweatbands, are allowed outdoors, and those items are prohibited indoors. See, <u>id.</u>; <u>Minnesota DOC Directive 302.300(A)(6)(c), (d), and (e)</u>. Directive 302.020 also prohibits prisoners from wearing necklaces outside of their clothing, in order to prevent conflicts among inmates. See, <u>Docket No. 33</u> at ¶12; <u>Minnesota DOC Directive 302.020(A)(1)(b)</u>.

We find that the Plaintiff is unlikely to succeed on the merits of this claim, as he has not shown a substantial burden on his religious practice. The Plaintiff maintains that his religious beliefs require him to "cover [his] head in the public eye," but notably, he does not allege that his head must be covered by a Kufi, see, <u>Plaintiff's Affidavit</u>, supra at p. 7 of 10, and he does not assert that the available alternative -- covering his head in the yard with a state-issued cap -- is unsatisfactory for religious reasons. See, <u>Hodgson v. Fabian</u>, 2009 WL 2972862 at *13 (D. Minn., September 10,

- 24 -

2009)(plaintiff did not allege that the inability to keep prayer oils in his cell substantially burdened his religious practice). As to the Islamic medallion, the Plaintiff asserts that it expresses his identity, but he does not explain how it relates to his religious practice.

Even if the garment policies impose a substantial burden on the Plaintiff's religious exercise, the Plaintiff is still not likely to succeed on his RLUIPA claim, as the Defendants' compelling interests in safety and security, and the narrowly-tailored Regulations, which do not prohibit wearing those items altogether. See, Junaid v. Kempker, 2009 WL 881311 at *8 (E.D. Mo., March 27, 2009)(policy restricting religious headgear to religious activities, and outdoors, does not violate the RLUIPA), citing Rogers v. Scurr, 676 F.2d 1211, 1216 (8th Cir. 1992); Jonas v. Schriro, 2006 WL 2772641 at *5 (D. Ariz., September 25, 2006)(compelling interest in security and discouraging gang affiliation justified policy prohibiting headbands outside of recreational area, and religious services); Portley-El v. Zavaras, 188 F.3d 519 at *2 (10th Cir. 1999)(in First Amendment claim, headgear poses potential security threat, as headgear may be used to conceal drugs, weapons, or other contraband, and "may spark internal violence among prisoners"); Young v. Lane, 922 F.2d 370, 375, 376 (7th Cir. 1991)(in First Amendment claim, the Government has a "strong interest in

uniform dress regulations," "modern-day courts recognize that gangs pose a 'serious challenge'" to institutional security, and gangs "try to identify their members by means of such visual aids as hats"); <u>Charles v. Frank</u>, 101 Fed.Appx. 634, 636 (7th Cir. 2004), cert. denied, 543 U.S. 980 (2004)(Regulation prohibiting visible prayer beads outside of prisoners' cells did not violate the RLUIPA).[11]

        c)    <u>Halal Meals</u>.

        The Plaintiff argues that the Defendants have placed a substantial burden on his religious practice by failing to provide Halal meals, see, <u>Amended Complaint, Docket No. 11</u>, at p. 6, because the non-pork food is often cross-contaminated with pork products, rendering it unfit for consumption, see, <u>Affidavit of David Islam</u>, <u>Docket No. 39</u>, at p. 1 of 1; <u>Sworn Statement of Philip Vance</u>, <u>Docket No. 40</u>, at p. 1 of 1, and the meals are not certified Halal by a reputable

---

[11]In his Reply Brief, the Plaintiff argues that the Defendants could easily avoid the dangers they allege by implementing protocols for determining who is a sincere Muslim, and who intends to abuse the religious allowances afforded Muslim prisoners, in order to cause disorder, and threaten the security of the prison. See, <u>Plaintiff's Reply</u>, supra at p. 7 of 13. As the Plaintiff readily admits, however, the prisoners at MCF-Stillwater have all been convicted of a crime, see, <u>id.</u> at p. 4 of 13, and so, his proposal does not adequately address the Defendants' compelling concerns in this Level 4 Facility. See, <u>Blackmon Aff.</u>, supra at ¶6. Additionally, while the RLUIPA requires the State to employ narrowly-tailored means, it does not require prisons to have considered "every conceivable option." See, <u>Folwer v. Crawford</u>, 534 F.3d 931, 940 (8th Cir. 2008), cert. denied, --- U.S. ---, 129 S.Ct. 1585 (2009).

organization, see, <u>Plaintiff's Reply</u>, supra at p. 5 of 13.  In his Memorandum in Support of the Complaint, see, <u>Docket No. 2</u>, at p. 4 of 34, the Plaintiff also asserts that the Defendants have violated his rights by failing to provide for two (2) religious special meals during each year.  The Defendants respond that the Plaintiff has not exhausted his administrative remedies "with respect to any claims related to a halal diet," see, <u>Defendants' Memorandum Opposing</u>, <u>Docket No. 29</u>, at p. 10, and that his informal complaints concerned only claims of cross-contamination.  <u>Id.</u> at p. 7.

In <u>Jones v. Bock</u>, 549 U.S. 199 (2007), the Supreme Court recently considered the role that a prisoner's failure to exhaust his administrative remedies should play in the context of deciding the merits of a claim, which is brought under Section 1983. The Court began its analysis by noting that requiring prisoners to exhaust their administrative remedies had the positive effect of allowing prison officials "an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court," which, in turn, "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record."  <u>Id.</u> at 204, citing <u>Woodford v. Ngo</u>, 548 U.S. 81, 94 n. 4 (2006).

Those purposes served as the backdrop to the Court's consideration of the exhaustion requirement, that Congress included in the Prison Litigation Reform Act ("PLRA"), which provides as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Title 42 U.S.C. §1997e(a).

The Court first considered whether exhaustion, which is "mandatory under the PLRA," is a pleading requirement that must be satisfied by the prisoner in his Complaint, or if it must be pled, and proved, by the defendant. See, Jones v. Bock, supra at 211, citing Porter v. Nussle, 534 U.S. 516, 524 (2002). After noting that the drafters of the PLRA failed to impose a stringent pleading requirement on prisoners, the Court concluded that the "failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints." Id. at 216. The Court further clarified that Courts, which are charged with determining exhaustion, should do so on a case-by-case basis, with each prisoner's Complaint being evaluated in light of its compliance with established prison grievance procedures. Id. at 218.

The Court concluded by considering "mixed claims," in which a prisoner has failed to exhaust some, but not all, of the claims asserted in his or her Complaint. In general, "if a complaint contains both good and bad claims, the court proceeds with the good and leaves the bad," and the Court distinguished the exception to this general rule -- the total exhaustion requirement in Habeas Corpus -- because of the implication that Habeas relief has on principles of comity and federalism. Id. at 221-222. The Court concluded that the language in Section 1997e(a) of PLRA, which provides that "[n]o action shall be brought" unless administrative procedures are exhausted, allowed Courts to follow the typical claim-by-claim approach, and precluded blanket dismissal of a prisoner's Complaint that contained both exhausted and unexhausted claims. Id.

As we have detailed, the State Defendants contend that the Plaintiff has not exhausted his administrative remedies, with respect to his claims regarding the food provided at MCF-Stillwater. The State Defendants have provided copies of the Grievance Procedures of the Minnesota DOC. See, Affidavit of Kim Ebeling ("Ebeling Aff."), Docket No. 34, Exhibit 1. The sequential grievance system provides that, if a prisoner is unsatisfied with the response he received, after filing an informal kite complaint, he can bring an official complaint, by submitting an Offender Grievance Form to the Facility Grievance Coordinator. Id., Exhibit 1 at p. 2 of 4. If

the prisoner does not receive a response, within twenty (20) working days of the date on which the grievance was logged, or if he receives a response, but is not satisfied with it, he can submit an appeal to the Central Office Grievance Coordinator, within fifteen (15) days of the date on which the decision was signed,  id., Exhibit 1, at pp. 2-3 of 4, for a decision from an Assistant or Deputy Commissioner, see, id., Exhibit 1, at pp. 3-4 of 4.

The decision of the Commissioner is final and, "[o]nce a grievance appeal has been resolved by the assistant or deputy commissioner or the Commissioner, there will be no further appeals."  Id., Exhibit 1 at p. 4.  In the alternative, should the prisoner fear that his safety would be threatened, were it known that he had filed a grievance at his facility, he has the option of immediately grieving to the Central Office Grievance Appeal Coordinator, for final decision.  Id., Exhibit 1, at p. 3.  Therefore, in order to have exhausted the pertinent administrative grievance procedure, a prisoner must follow the sequential process through to a final determination, by the Commissioner or the Central Office.

"Courts recognize only three exceptions to the exhaustion requirement, including futility, inability of the administrative remedies to provide adequate relief, and the establishment of an agency policy or practice of general applicability that is

contrary to law." <u>Blackmon ex rel. Blackmon v. Springfield R-XII School Dist.</u>, 198 F.3d 648, 656 (8th Cir. 1999), citing <u>Urban by Urban v. Jefferson Co. School Dist. R-1</u>, 89 F.3d 720, 724 (10th Cir. 1996). "An administrative remedy will be deemed futile if there is doubt about whether the agency could grant effective relief." <u>Ace Prop. & Cas. Insur. Co. v. Federal Crop Ins.</u>, 440 F.3d 992, 1000 (8th Cir. 2006), citing <u>McCarthy v. Madigan</u>, 503 U.S. 140, 147 (1992).

Here, the Defendants have submitted an Affidavit which attests that the Plaintiff has filed only one (1) grievance appeal during his incarceration -- Grievance No. 3725, dated December 18, 2008 -- in which he complained of the burden imposed by the policies regarding his five (5) daily prayers, his Kufi, his Islamic medallion, and the volunteer requirement. See, <u>Ebeling Aff.</u>, supra at ¶5. They argue that, as a consequence, the Plaintiff's claims, as to the Halal diet, should be dismissed.

The Plaintiff does not competently controvert the Defendants' attestation, that he failed to exhaust his administrative remedies as to the Halal diet. Instead, the Plaintiff vaguely asserts that he filed a variety of "grievances" concerning his "religious rights pursuant to 42 U.S.C. §§2000cc-et seq., and a request to practice Islam in detail." See, <u>Plaintiff's Motion</u>, at ¶4. The Plaintiff included Grievance No. 3725 with his Complaint, as well as the responses to that grievance, and his appeal.

See, <u>Docket No. 1-2</u>, Exhibit Nos. 13-19, at pp. 6-14 of 24.  Grievance No. 3725 concerns only the Plaintiff's five (5) daily prayers, his prayer cap, the volunteer requirement, and the "religious emblem," or medallion.  See, <u>id</u>.

Further, there is no evidence which would demonstrate that administrative exhaustion would have been futile, that inadequate relief was unavailable, nor that the policies regarding Halal meals and religious feasts were contrary to law.  See, <u>Minnesota DOC Directive 302.030</u>, <u>David Reishus Affidavit</u>, <u>Docket No. 31</u>, Exhibit 1 (procedures for handling pork); see also, <u>Patel v. United States Bureau of Prisons</u>, supra at 814 (no RLUIPA violation where prison offered alternative meal line, and option to purchase vegetarian items to satisfy Halal diet).  Accordingly, we find that the Plaintiff has not exhausted his administrative remedies as to his claims regarding the meals provided at MCF-Stillwater.[12]

---

[12]In his Exhibits, the Plaintiff has submitted copies of several informal requests, sent by kite or by letter, to various prison officials.  See, <u>Docket No. 1-2</u>, Exhibit No. 3, at pp. 3-9 of 24, and Exhibit No. 9, at pp 16-23 of 24; <u>Docket No. 1-3</u>, Exhibit No. 12, at p. 5 of 24, and Exhibit No. 20, at p. 15-20 of 24.  With the exception of Exhibit 9, those informal requests assert that the food provided is not Halal, and request pre-packaged Halal meals, which have been certified by a reputable organization. Although those requests are intermingled among the kites, and grievances, relating to Grievance No. 3725, none of the formal Grievance documents, which were completed by the Plaintiff, or by the Defendants, reference the meals.   In fact, the acknowledgment of Grievance No. 3725, see, <u>Docket No. 1-3</u>, Exhibit No. 14, at p.
(continued...)

As the Plaintiff has not exhausted his administrative remedies, we find that he will not prevail on the merits of his claims concerning the Halal diet, and religious feasts, because the "[f]ailure to adhere to DOC's sequential grievance process after the sending of the kite to a pertinent staff member is fatal to plaintiff's suit * * * ." <u>Roth v. Larson</u>, 2008 WL 4527831 at *16 (D. Minn., September 30, 2008)(granting Summary Judgment, based upon a failure to exhaust, notwithstanding the plaintiff's submission of numerous kites, given the plaintiff's failure to file a formal grievance, and appeal); see also, <u>Jones v. Bock</u>, supra at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but **it is the prison's requirements**, and not the PLRA, that define the boundaries of proper exhaustion.") [emphasis added]; <u>Garcia v. Schull</u>, 2007 WL 295614 at *5 (D. N.D., January 29, 2007)("Woodford does not allow for substantial compliance; it requires proper exhaustion."), citing <u>Woodford v. Ngo</u>, supra.

---

[12](...continued)
7 of 24, and the Response to Grievance No. 3725, see, <u>Docket No. 1-3</u>, Exhibit No. 15, at p. 8 of 24, specifically list the daily prayers, the prayer cap, the volunteer requirement, and the religious emblem, but not the meals, and the Plaintiff's appeal of that response does not discuss the meals, though he raises a new issue -- that Jumu'ah had been cancelled for Christian holidays. See, <u>Docket No. 1-3</u>, Exhibit No. 16, at p. 10 of 24. As presented, those informal requests were not incorporated into a grievance process, and therefore, they do not satisfy the administrative exhaustion requirement.

b.    The Plaintiff's Equal Protection Claims.

The Plaintiff also asserts a violation of the Fourteenth Amendment, and appears to base that claim on the cancellation of Jumu'ah for the Thanksgiving, the Christmas, and the Independence Day holidays, as well as the policy allowing only one religious special group meal per year, and on the provision of pre-packaged Kosher meals to Jewish inmates, but not pre-packaged Halal meals to Muslim inmates.  The Defendants argue that the services were cancelled for State holidays, that religious programming is usually cancelled for State holidays, that cancellation of a religious activity in favor of State holiday, rather than another religion, does not violate the Equal Protection Clause, and that the religious special meal rule applies to all religions.  See, Defendant's Memorandum in Opposition ("Defendants' Opp."), Docket No. 29, at p. 20; Blackmon Aff., supra at ¶8; Julson Aff., supra at ¶13.

We find that the Plaintiff is unlikely to succeed on the merits of those claims. "The heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest."  Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998)[en banc], citing Timm v. Gunter, 917 F.2d 1093, 1103 (8th Cir. 1990), cert.

denied, 501 U.S. 1209 (1991); see also, <u>Murphy v. Missouri Dep't of Corrections</u>, supra at 984; <u>Fegans v. Norris</u>, supra at 906.  For a claim of discrimination based on religion, a prisoner must show that he is "denied a reasonable opportunity to pursue [his] faith as compared to inmates of other religions."  <u>Runningbird v. Weber</u>, supra at 578; see also, <u>Cruz v. Beto</u>, 405 U.S. 319, 322 (1972).  He must also show that the discrimination is purposeful.  See, <u>Patel v. United States Bureau of Prisons</u>, supra at 816.

Here, the Defendants have submitted competent evidence demonstrating that religious services are usually cancelled for State holidays and, in fact, the Exhibits the Plaintiff submits to support his claim demonstrate that there were "no religious services" on Thursday, November 27, 2008, or Friday, November 28, 2008, see, <u>Docket 1-4</u>, Exhibit No. 23, at p. 1 of 19, and that religious services held on Saturday, July 4, 2008, were cancelled as well, see, <u>Docket 39-3</u>, Exhibit No. 2b, at p. 1 of 1. As a result, the Plaintiff has not shown that he was treated differently from other prisoners, because of his religion, and his Equal Protection claim is not likely to succeed.[13]  See, <u>Aziz v. Groose</u>, 74 F.3d 1243, 1243 (8th Cir. 1996)("Everything about

---

[13]The Plaintiff alleges that he was treated differently from other prisoners because "institutional programming," such as sports, were not cancelled for the
(continued...)

which [the plaintiff] complains applies to adherents of all other religions * * *; [t]hus there was no equal protection violation."); <u>Rouse v. Benson</u>, 193 F.3d 936, 943 (8th Cir. 1999)("[The plaintiff] has not presented this court with any evidence showing that other inmates following other religions have not been similarly limited[.]").

The Plaintiff asserts that Jumu'ah has been cancelled for nine (9) Christian holidays. See, <u>Complaint</u>, supra at ¶17. However, the Plaintiff's Exhibits show that Jumu'ah was cancelled for Thanksgiving, see, <u>Docket No. 1-4</u>, Exhibit No. 23, at p. 1 of 19, for the day after the New Year, see, <u>id</u>, Exhibit No. 24, at p. 2 of 19, and Independence Day, see, <u>Docket No. 39-3</u>, Exhibit No. 2b, at p. 1 of 1. None of those are Christian holidays, and numerous Courts have held that the public holiday of Christmas Day is secular, and therefore, does not violate the Establishment Clause.

---

[13](...continued) Independence Day holiday, and may have an inmate leader. See, <u>Amended Complaint</u>, supra at p.7 of 11; <u>Plaintiff's Memorandum in Support of Complaint, Docket No. 2</u>, at p. 11 of 34. Such treatment is not an equal protection violation. See, <u>Burks-Bey v. Stevenson</u>, 328 F. Supp.2d 928, 936 (N.D. Ind. 2004)("The Fourteenth Amendment requires that the religious rights of inmates belonging to minority or non-traditional sects be respected to the same degree as the rights of those belonging to larger and more traditional denominations."); <u>Cooper v. Tard</u>, supra at 130 (finding that different rules for sports activities, and religious meetings, did not violate Equal Protection because of the "fundamental difference" between the two types of activities).

See, <u>Blagman v. White</u>, 112 F. Supp.2d 534, 540 (E.D. Va. 2000)(citing cases), aff'd, 3 Fed.Appx. 23 (4th Cir. 2001).

As to the religious meals, the Plaintiff contends that extra food is served on Christmas and Easter, and that Jewish inmates are provided pre-packaged Kosher meals. We also find it unlikely that the Plaintiff would succeed on those claims, since, as we have addressed, he has not exhausted his administrative remedies as to the meals provided. In addition, the Plaintiff likely has not shown purposeful discrimination, as to the meals in question. See, <u>Patel v. United States Bureau of Prisons</u>, at 815-16. The holiday menu submitted does not include a separate menu for Easter, see, <u>Docket No. 1-4</u>, Exhibit No. 25, at p. 3 of 19, and, as noted, the State observation of Christmas as a legal holiday is generally secular. In addition, the Affidavits submitted by the Defendants show that the DOC's decisions regarding Halal meals, self-selection, and handling of pork, are based on their understanding of the pork-free requirements of a Halal diet, not on a purpose to discriminate against Muslim prisoners. See, <u>Reishus Aff.</u>, supra; <u>Hobson Aff.</u>, supra at ¶7. Accordingly, the Plaintiff has not demonstrated favorable treatment of another religious group, and so is not likely to succeed on the merits of his claims of violations of Equal Protection.

        c.     <u>The Plaintiff's Claims under the Minnesota Constitution</u>.

The Plaintiff has also asserted a claim under the Minnesota Constitution's "freedom of conscience" clause, which reads, in relevant part, as follows:

> The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship[.]

Minnesota Constitution, art. I, §16.

In a test which mirrors the RLUIPA standard, the Minnesota Supreme Court has held that the clause prohibits the State Government from placing excessive burdens on sincerely-held religious beliefs, without a compelling justification, and use of the least restrictive means. See, Hill-Murray Federation v. Hill-Murray High School, 487 N.W.2d 857, 866-67 (Minn. 1992); Edina Community Lutheran Church v. State, 745 N.W.2d 194, 203 (Minn. App. 2008).

For the reasons we detailed in our discussion of the Plaintiff's RLUIPA claims, his claims most likely fail under the Minnesota Constitution, for lack of a substantial burden, or because of the overriding compelling State interests. Therefore, the

Plaintiff has shown neither a likelihood of success on the merits, nor irreparable harm in relation to his claims under the Minnesota Constitution.

        d.     <u>The Plaintiff's Claims Raised under Criminal Statutes</u>.

        The Plaintiff also raises several claims under the provisions of the Federal Criminal Code, including under Title 18 U.S.C. §§2 (principal actors); 4 (concealment of a felony); 241 (conspiracy against rights); 371 (conspiracy); 1505 (obstruction of justice); 1905 (disclosure of confidential information). As our Court of Appeals has recognized:

> The fact that [the plaintiff] is basing [his] §1983 claim on the violation of a criminal statute "does not necessarily preclude the implication of a private cause of action for damages," Cort v. Ash, 422 U.S. 66, 79, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), but it is well-settled that criminal statutes will rarely survive §1983 analysis.

<u>Frison v. Zebro</u>, 339 F.3d 994, 999 (8th Cir. 2003).

The Court went on to explain, as follows:

> Criminal statutes, which express prohibitions rather than person entitlements and specify a particular remedy other than civil litigation, are * * * poor candidates for the imputation of private rights of action, [as] the Supreme Court has been unwilling to treat criminal laws as implying private entitlements * * * and has held that the victims of crime therefore lack any legal right to compel a criminal prosecution[, and] [t]hat reluctance to form private entitlements from criminal prohibitions blocks the judicial creation of private rights of action as well.

<u>Id.</u>, quoting <u>Chapa v. Adams</u>, 168 F.3d 1036, 1038 (7th Cir. 1999).

As a consequence, Courts have rejected private actions predicated on the same criminal provisions that the Plaintiff has invoked here.  See, e.g., <u>Central Bank v. First Interstate Bank</u>, 511 U.S. 164, 190 (1994)("[W]hile it is true that an aider and abettor of a criminal violation of [the Securities and Exchange Act] violates 18 U.S.C. §2, it does not follow that a private civil aiding and abetting cause of action must exist."); <u>Massad v. Greaves</u>, 554 F. Supp.2d 163, 167 (D. Conn. 2008)("Given that the statutory language does not contain an express civil cause of action, and the Supreme Court has made clear that courts are not to read implied civil causes of action into criminal statutes, the defendant is plainly incorrect in her contention that [the plaintiff] could have pled 18 U.S.C. §4 as the basis for her suit."); <u>Barr v. Camelot Forest Conservation Ass'n, Inc.</u>, 153 Fed.Appx. 860, 862 (3rd Cir., November 3, 2005)(affirming District Court's dismissal of claims brought under Title 18 U.S.C. §241 because it is a "criminal offense[] for which there is no civil remedy."), cert. denied, 547 U.S. 1193 (2006); <u>Andrews v. Heaton</u>, 483 F.3d 1070, 1076 (10th Cir. 2007)(affirming dismissal of claims alleging violations of Title 18 U.S.C. §§241 and 371, as "these are criminal statutes that do not provide for a private right of action and are thus not enforceable through a civil action."), citing <u>United States v. Claflin</u>, 97

U.S. 546, 547 (1878); <u>Kafele v. Frank & Wooldridge Co.</u>, 108 Fed.Appx. 307, 308 (6th

Cir., August 17, 2004)(affirming dismissal of claim under Title 18 U.S.C. §1505, as

the plaintiff had "no private right of action against the defendants for alleged

violations of [that] criminal statute[]."); <u>Thomas v. Bryant</u>, 2009 WL 2473662 at *2

(W.D. Wash., August 7, 2009)("While 18 U.S.C. §1505 does make the obstruction of

justice a federal crime, private rights of action brought under the statute are also not

recognized."), citing <u>De Pacheco v. Martinez</u>, 515 F. Supp.2d 773, 787 (S.D. Tex.

2007); <u>Burnside-Ott Aviation Training Center, Inc. v. United States</u>, 617 F. Supp. 279,

285 (S.D. Fla. 1985)("Section 1905, of course, is a criminal provision, and affords no

private right of action to prevent disclosure in violation of its provisions."), citing

<u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 316-17 (1979).

Therefore, finding that none of the Federal criminal statutes, which are relied

upon by the Plaintiff, provide for a private right of action, we conclude that the

Plaintiff has no chance of success as to the merits of those claims under Section 1983.

e.      The Plaintiff's Claims of Conspiracy.

The Plaintiff also alleges a claim of conspiracy to interfere with his civil rights, pursuant to Title 42 U.S.C. §1985. Although he does not specify, only subsection (3) of that Statute could apply to the allegations of his Complaint. Additionally, he has also not alleged that the Defendants have improperly infringed upon his right to vote, and accordingly, we limit our discussion of his Section 1985(3) claim to the first or the "Equal Protection" section of that Statute.

Our determination of the Plaintiff's likelihood of success on this claim is guided by our Court of Appeals' decision in Federer v. Gephardt, 363 F.3d 754, 757-58 (8th Cir. 2004), where the Court, in reviewing the dismissal of a claim, observed as follows:

> To state a claim under the equal protection provision of the first part of §1985(3), [the plaintiff] must allege (1) a conspiracy, (2) for the purpose of depriving another of the "equal protection of the laws, or of equal privileges and immunities under the laws;" (3) an act in furtherance of the conspiracy; and (4) an injury to the person or property, or the deprivation of a legal right. Griffin v. Breckinridge, 403 U.S. 88, 102-03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); 42 U.S.C. § 1985(3). A claim under this part of the section must also allege a class-based animus, Griffin, 403 U.S. at 102, 91 S.Ct. 1790. In addition, [the plaintiff] must allege that an independent federal right has been infringed. Section 1985 is a statute which provides a remedy, but it grants no substantive stand-alone right. The source of the

- 42 -

> right or law must be found elsewhere. United Bhd. Of
> Carpenters and Joiners of Am. v. Scott, 463 U.S. 825, 833,
> 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); Great Am. Fed.
> Sav. & Loans Ass'n. v. Novotny, 442 U.S. 366, 376, 99
> S.Ct. 2345, 60 L.Ed.2d 957 (1979).

Id. at 757-758; see also, Dornheim v. Sholes, 430 F.3d 919, 924 (8th Cir. 2005), citing Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68 (1993).

As we have discussed at length, the Plaintiff is not likely to succeed on his claims of constitutional, or RLUIPA violations, based upon his exercise of his religious rights, and therefore, he is not likely to succeed on his derivative claim that the Defendants conspired to violate those civil rights.

Therefore, since we find that the likelihood that the Plaintiff will succeed on the merits of his claims does not weigh in favor of his request for a preliminary injunction, we also find that the Plaintiff has failed to establish any irreparable harm. See, Education Minnesota Lakeville v. Independent School Dist. No. 194, supra at 1080 ("[B]ecause Plaintiffs have not shown that their First Amendment rights have been violated, * * * the Court cannot say that they have 'demonstrate[d] a sufficient threat of irreparable harm.'"); cf., Laughlin v. Norris, 1999 WL 314121 at *1 (8th Cir., May 17, 1999)(finding that the District Court did not abuse its discretion in denying a prisoner's Motion for a Temporary Injunction where the prisoner failed to demonstrate a probability of succeeding on the merits). Furthermore, given the

Plaintiff's failure to establish violations of the First Amendment, the RLUIPA, or the Equal Protection Clause, we are not persuaded that any harm, which might result from the restrictions on the Plaintiff's actions, substantially outweighs society's interest in the effective administration of its penal systems. As a consequence, we recommend that the Plaintiff's Motion for a Preliminary Injunction be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Plaintiff's Motion for a Temporary Restraining Order, or a Preliminary Injunction [Docket No. 4], be denied.

Dated: December 23, 2009          *s/Raymond L. Erickson*
                                  Raymond L. Erickson
                                  CHIEF U.S. MAGISTRATE JUDGE

# N O T I C E

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than January 6, 2009,** a writing which specifically identifies those portions of the Report

to which objections are made and the bases for those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of the Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 6, 2009,** unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.