UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

HANIFI MARLOW JIHAD,

            Plaintiff,

      vs.                        REPORT AND RECOMMENDATION

Commissioner JOAN FABIAN;
Assistant Commissioner DAVID
CRIST; Warden JOHN KING;
Assoc. Warden EDDIE MILES;
Program Director BRUCE JULSON;
Program Director DAVID REISHUS;
Religious Cord. GREGORY SKRYPEK;
Chaplain NORRIS BLACKMON; and
Assoc. Warden MICHELLE SMITH,

            Defendants.             Civ. No. 09-1604 (SRN/LIB)

_____

      Hanifi Marlow Jihad, pro se.
      Angela Behrens, Assistant Minnesota Attorney General, for Defendants.

_____

LEO I. BRISBOIS, United States Magistrate Judge

      This matter is before the court on the parties' cross-motions for Summary Judgment (Dkts.

131 and 162); the Motion to Dismiss of Defendants Norris Blackmon and Gregory Skrypek (Dkt.

144); and Plaintiff's Motion to Strike (Dkt. 152). The motions have been referred to the undersigned

for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons

stated below, the Court finds that Plaintiff's motion for summary judgment should be denied; that

Defendants' motion for summary judgment should be granted in part and denied in part; that the

motion to dismiss should be granted as to Defendant Skrypek; and that Plaintiff's Motion to Strike

should be denied.

## I.   FACTUAL BACKGROUND

Plaintiff Hanifi Marlow Jihad is currently serving a life sentence following a conviction for first degree murder.  See, State v. Jones, 556 N.W.2d 903, 905 (Minn. 1996)(affirming conviction).[1]

Jihad is currently incarcerated at the Minnesota Correctional Facility at Stillwater, Minnesota (MCF-Stillwater).  (Final Am. Compl., Dkt. 120, ¶ 3).

Jihad identifies as a practicing Muslim, and in this lawsuit, he alleges that prison officials have unlawfully burdened and infringed upon his right to freely practice his religion.  Jihad brings his claims under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §2000cc-1 et seq.; under Section 1983 for violations of the free exercise clause of the First Amendment and the Equal Protection clause of the Fourteenth Amendment; and under the Minnesota Constitution.  Construing Jihad's pro se submissions liberally, the Court understands Jihad to challenge the following policies and decisions: (1) a policy prohibiting him from wearing a prayer cap, or kufi, when he is not in his cell or the chapel; (2) a policy preventing him from performing his five daily prayers outside of his cell, which contains a toilet; (3) the denial of his request for halal-certified meals; (4) a policy limiting celebrations for religious holidays to one special meal per year; (5) a policy requiring that a volunteer be present for all group religious services; and (6) the cancellation of religious services on state holidays.

Defendants are current and former employees of the Minnesota Department of Corrections (DOC).  Jihad alleges Defendants were involved in or were responsible for the decisions and policies

---

[1]      Plaintiff was formerly known as Marlow Devette Jones.  See, Jihad v. State, 594 N.W.2d 522, 523 (Minn. 1999).

he is currently challenging.  Defendant Joan Fabian is the Commissioner of the DOC, and she is sued in her individual and official capacity for permitting or approving certain policies that allegedly violate Jihad's religious rights.  The remaining Defendants appear to be sued primarily for their involvement in the facility's decisions to deny Jihad's various requests for religious accommodations.  Defendant David Crist is the Assistant Commissioner of Corrections; Defendant John King is the Warden at MCF-Stillwater; Defendant Eddie Miles is identified as the Associate Warden at MCF-Stillwater; Defendant Michelle Smith is also identified as the Associate Warden at MCF-Stillwater; Defendant Bruce Julson is a Program Director and is responsible for overseeing religious programming at MCF-Stillwater; Defendant David Reishus is the Program Director for Administration and appears to be responsible for overseeing the kitchen facilities at MCF-Stillwater; Defendant Gregory Skrypek formerly served as the religious coordinator at MCF-Stillwater until he retired in May 2009; and Defendant Norris Blackmon works part-time at MCF-Stillwater as a religious coordinator.

MCF-Stillwater houses approximately 1,400 inmates, and it is designated as a level four custody facility, with level five being the highest custody level.  (First Blackmon Aff., Dkt. 32, at ¶ 6).  The inmates at level four facilities generally have been convicted of serious and violent offenses, are serving longer sentences, or present a greater risk to security and public safety than the inmates at lower custody level facilities.  (Id.)

The inmates at MCF-Stillwater "have a wide spectrum of religious beliefs," and "[n]early every known religious faith is held by someone in the facility."  (Id. at ¶ 4).  MCF-Stillwater has approximately 140 inmates who identify as Muslim.  (First Julson Aff., Dkt. 33, at ¶ 4).

Defendant Norris Blackmon, who works part-time as a religious coordinator at MCF-Stillwater, states that inmates are allowed a number of opportunities to practice their religious beliefs:

> "[I]nmates may participate in religious services with other inmates of the same faith; worship privately; designate up to five personal items as religious items; store community religious items with in [sic] a staff-designated location; purchase personal religious items at each facility; wear approved religious items; obtain religious material at the prison's library or through the mail; have an annual religious special meal; follow a religious diet; access spiritual and religious counseling services through the religious coordinator, chaplains, contract staff, and volunteers; and have individual community counseling visits by clergy or religious leaders in the visiting room or an alternative site."

(First Blackmon Aff., at ¶ 11).  These policies apply to all inmates, regardless of religious affiliation.

The DOC has formalized its policies regarding inmate's religious practice through Policy No. 302.300 entitled "Religious Programming" which states:

> "Facilities will provide all offenders with reasonable opportunities to pursue individual religious beliefs and practices, within facility budgetary and security constraints.  Attendance at or participation in religious activities may not be restricted on the basis of race, color, nationality, sex, sexual orientation, or creed.  Offenders are not required to attend religious services."

(Dkt. 33-1, Exh. 2, at p. 3 of 9).  The policy's provisions also deal with the purchase and possession of religious items, staffing of religious programming, religious services, religious counseling, and religious diets and meals.

The DOC requires inmates in custody level four and five facilities to have an outside volunteer present for religious services; this requirement applies to all religious groups at the

affected facilities.  (First Blackmon Aff., at ¶ 6).  Generally, inmates are responsible for finding outside volunteers to supervise their religious services, but the prison chaplain may assist the inmates in finding volunteers.  (Julson Aff., at ¶ 8).  According to Norris Blackmon, the outside volunteer requirement for religious services promotes security within the correctional facility.  (First Blackmon Aff., at ¶ 7).  Blackmon states that permitting inmates to lead religious services "would risk creating hierarchies among inmates, which can lead to conflicts and jeopardize security."  (Id.) In addition, Blackmon states that allowing inmates to conduct unsupervised religious services "could open the door for gang activity."  (Id.)  According to Blackmon, requiring an outside volunteer ensures that all inmates remain on equal footing during the service, and further ensures that inmates are actually using the time for religious services.  (Id.); (Julson Aff., at ¶ 7).  Joseph Hobson, who is employed as the religious coordinator at MCF-Stillwater, states that inmates may use religious services for illicit purposes if left unsupervised, and that he is aware of instances where known gang members have passed notes and conferred with each other during religious services, even with the presence of an outside volunteer.  (Second Hobson Aff., Dkt. 166, at ¶ 9).  Hobson states that such conduct would be further exacerbated if inmates were permitted to congregate without a volunteer. (Id.)  According to Hobson, having an outside volunteer present ensures that inmates are following the traditions of the faith during the services.  (Id.)  Because of this policy, religious services are sometimes cancelled when a volunteer is not present.  (Id.)

In addition, the DOC does not permit corrections officers (COs) to serve as religious volunteers for several reasons.  (Id. at ¶ 11).  First, COs are not qualified to determine standard religious practice or what constitutes a proper religious observance.  (Id.)  In addition, requiring COs

to supervise religious services would create a dual role for COs to handle security concerns and to facilitate religious services.  (Id.)  Hobson states that COs should not be put in this position since it would inevitably lead to conflicts with inmates.  (Id.)  Hobson states that when COs are assigned to the chapel for security purposes, the CO is stationed at or near a desk that is located outside of the chapel.  (Id.)

Muslims are afforded four opportunities to congregate for religious activities each week. (First Hobson Aff., at ¶ 4).  This includes Jumu'ah, Tuesday and Thursday worship services, and a Sunday study group.  (Id.)  According to Joseph Hobson, the Qu'ran and Hadith, which are considered the holy Islamic texts, require attendance at one service, Jumu'ah, in order to be considered "in good standing as a Muslim."  (Id. at ¶ 3).  Jumu'ah is held on Fridays.

According to Defendant Bruce Julson, who currently oversees religious programming at MCF-Stillwater, the chapel has a capacity of 70 people.  (Julson Aff., at ¶ 6).  In April or May 2008, the Muslim population surpassed this number, and as such, the DOC added a second Jumu'ah service in October 2008 so as to accommodate all Muslims who wanted to attend Friday Jumu'ah services every week.  (Id. at ¶s 4, 6).  In order to attend one of the services, an inmate must send a "kite" to DOC staffperson Theresa Dunn.  (Id. at ¶ 6).  Dunn then places the inmates into one of two groups, she issues movement passes, and the inmates are then able to attend the Jumu'ah service corresponding to their group assignment.  (Id.).  Because the chapel has a capacity of seventy, the first seventy inmates to sign up for services are permitted to attend, with the exception of Jumu'ah, which is now available to all inmates.

Defendants submit that religious programming may be cancelled for several reasons, and the reasons for cancellation "apply without regard to an inmate's particular religious beliefs." (First. Blackmon Aff., at ¶ 8). As the Court previously discussed, a religious service can be cancelled if a volunteer is not available. (Id.) In addition, religious programming is generally cancelled on state holidays.[2] (Id.) Lastly, religious programming may be cancelled if there is a security risk. (Id.) For instance, on one occasion services were cancelled when prison officials learned of threatened "hits" by members of a religious group. (Id.)

One of the tenets of the Islamic faith is that Muslims should pray five times every day. (Id. at ¶ 9). These five daily prayers are known as "salat." Blackmon indicates that other Muslims pray in their cells, and that nothing prohibits Muslims from praying within their cells. (Id.) Jihad claims that Muslims are prohibited from praying in the presence of toilets or graveyards, and as such, that it violates his religious beliefs to pray within his cell since it contains a toilet. As such, Jihad requests that he be permitted to utilize another location in the prison to perform salat.

Defendant Bruce Julson states that it would be unworkable to permit Muslim inmates to leave their cells five times per day for prayer. (Julson Aff., at ¶ 10). First, Julson states that the prayers cannot be performed in the chapel space, which is used by all other religious groups at the prison. Julson indicates that allowing one religious group to use the chapel at the expense of others would be unfair and would likely cause conflict amongst inmates. (Id.) Second, Julson states that

---

[2]     Jihad's own exhibits confirm that, where religious services were cancelled for a holiday, all religious services affected by the schedule were also cancelled. (Dkt. 1-4, Exh. 23, at p. 1 of 19)("no religious services" on Thursday, November 27, 2008, or Friday, November 28, 2008); (Dkt. 39-3, Exh. 2b, at p. 1 of 1)(all religious services cancelled on July 4, 2008).

inmates' daily schedules are highly regulated, and that they generally have programming and assignments throughout the day. (Id.) Moreover, movements within the facility are highly regulated in order to ensure the safety of staff and inmates. (Id.) As such, permitting Muslim inmates to travel five times per day to a different location to pray would "create an enormous administrative burden by requiring numerous passes to be issued and tracked, and staff to keep track of many inmates coming and going from the chapel multiple times every day." (Id.) If each of the 140 Muslim inmates chose to congregate for the five daily prayers, there would be an additional 1,400 inmate movements per day for prison officials to monitor and coordinate. Prison records indicate that Jihad has a prayer rug on his list of personal property that he is permitted to keep in his cell. (Second Hobson Aff., at ¶ 13).

DOC policy permits each religious group at the facility to select one religious holiday per year to celebrate with a special meal. (Id. at ¶ 7). The policy states that the meal must be prepared by food services and that food and money cannot be donated by inmates. (Dkt. 33-1, at pp. 5-6 of 9). The DOC does not decide which holiday a religious group celebrates; rather, each religious group determines the holiday it wants to celebrate with a special meal and then notifies the DOC of their choice. (Second Hobson Aff., at ¶ 7). MCF-Stillwater's Muslim group has selected Eid-al-Fitr as the holiday for which it will receive a special meal. (Id.) Jihad has participated in this special meal in the past. (Id.)

Eid-al-Fitr marks the end of Ramadan. (Id. at ¶ 3). Ramadan is a thirty-day period during which Muslims fast during daylight, from dawn until sunset. (Id. at ¶ 2). "Eid" means celebration, and "Fitr" means breaking the fast. (Id. at ¶ 3). Inmates are permitted to fast during Ramadan;

fasting inmates receive the same meal as other inmates, but they receive their meals before dawn and after sundown in a bag rather than on a tray.  (Id. at ¶ 2).  Inmates are also permitted to fast at any time during the year so long as they have a religious reason for the fast.  (Id.)  The DOC requires that fasts have a religious component in order to avoid hunger strikes among the inmates.  (Id.)

Jihad requests that Muslims also be permitted to celebrate Eid-al-Ahda with a special meal. Eid-al-Ahda is a celebration of sacrifice marking the end of Hajj, which  refers to the annual pilgrimage to Mecca.  (Id. at ¶ 4)  Hajj is one of the five pillars of Islam, and Muslims are required to travel to Mecca at least once in their lifetime.  Hajj may be recognized with a 10-day fast, with Eid-al-Ahda marking the end of Hajj and of the fast.

The special meal is comprised of food items that are selected by the inmates so long as the cost does not exceed five dollars per person.  (First Hobson Aff., at ¶ 8).  In general, DOC meals are provided at a cost of approximately three dollars per person.  (Id.)  Inmates generally take advantage of the increased meal budget and request as much food as possible for their special meal.  (Id.) "Given the benefits of extra food and control of the menu, most inmates would likely want special meals for all holidays."  (Id. at ¶ 9).  However, Defendants indicate that allowing more than one special meal per year would cause a hardship to the DOC in terms of its budget and staffing.  (Id.) Defendants represent that by allowing each religious group to designate one holiday for a special meal all religious groups are treated uniformly.  (Id.)

With respect to religious apparel, DOC policy permits inmates to wear designated religious items while they are in their cells or at the chapel during authorized religious services.  (Julson Aff.,

at ¶ 11).  Outside their cells, inmates are permitted to wear state-issued baseball caps or orange stocking caps.  (Id.)  During recreation, inmates may wear state-issued headbands.  (Id.)  If an inmate's work assignment requires headwear, the inmate may only wear the headwear in assigned work areas and while moving to and from the assigned work area.  (Id.)  According to Hobson, a kufi is not a religious item, and Muslims are required only to cover their heads while they are in a mosque.  (First Hobson Aff., at ¶ 5).  Hobson states that some Muslims choose to wear a kufi as a head-covering, but any head-covering would be adequate for accomplishing this goal.  (Id.)

Julson avers that the DOC's religious apparel policy promotes the safety and security of inmates and staff by promoting uniformity in appearance for all inmates while they are outside of their cells. (Julson Aff., at ¶ 12).  This prevents inmates from wearing items that could signal a gang affiliation, which could cause conflicts with other inmates.  (Id.)  Julson avers that minimizing conflict and hostility among inmates provides a safer environment for both inmates and staff.  (Id.)

## II.    STANDARD OF REVIEW

Summary Judgment is appropriate only when the evidence demonstrates that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(a); Smutka v. City of Hutchinson, 451 F.3d 522, 526 (8th Cir. 2006).  A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to

establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Mirax Chemical Products Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991).  However, the nonmoving party may not rest on mere allegations or denials in its pleadings, but must set forth specific admissible evidence-based facts showing the existence of a genuine issue.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  However, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at  322.  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.[3]

## III.    DISCUSSION

### A.    Sovereign Immunity

Defendants argue that Jihad's claims for damages against them in their official capacities are barred by the Eleventh Amendment.  The Court agrees.

---

[3]    Throughout his submissions, Jihad states that certain issues have already been ruled on by the Court, citing the Court's March 30, 2010 Order granting in part and denying in part his motion to amend.  (Dkt. 109).  In that Order, the Court merely found that Jihad had stated a claim for relief; it did not express any opinion as to whether he would ultimately prevail on any particular issue.

A suit against a public employee in that person's official capacity is merely a suit against the public employer.  Johnson v. Outboard Marine Corp., 172 F.3d 531, 535 (8th Cir. 1999), citing Kentucky v. Graham, 473 U.S. 159, 165 (1985).  "The Eleventh Amendment immunizes an unconsenting State from damage actions brought in federal court, except when Congress has abrogated that immunity for a particular federal cause of action."  Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996)[citations omitted], cert. denied, 519 U.S. 1148 (1997).  "To waive sovereign immunity, a state must make a clear, unequivocal statement that it wishes to do so."  Faibisch v. University of Minnesota, 304 F.3d 797, 800 (8th Cir. 2002), citing Atascadero State Hospital v. Scanlon, 473 U.S. 234, 238-40 (1985).

Here, Jihad has not established that Minnesota has waived its immunity from damages for any of the laws at issue in this case, nor has he established that Congress abrogated Minnesota's immunity with respect to any of the claims at issue.  See, Van Wyhe v. Reisch, 581 F.3d 639, 655 (8th Cir. 2009)(official capacity claims for damages not available under RLUIPA), cert. denied, 130 S.Ct. 3323 (May 24, 2010); Murphy v. State of Arkansas, 127 F.3d 750, 754 (8th Cir. 1997)(Section 1983 claims for damages against individual defendants in their official capacities are barred by Eleventh Amendment).  As such, to the extent that Jihad seeks damages from Defendants in their official capacities, such claims should be dismissed.

B.    Free Exercise Claims

Jihad's free exercise claims arise under the free exercise clause of the First Amendment of

the United States Constitution, the Freedom of Conscience Clause of the Minnesota Constitution, and the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. §2000cc-1 et seq.

With respect to free exercise claims under the United States Constitution, the Eighth Circuit has explained as follows:

> Although prisoners retain their constitutional rights, limitations may be placed on the exercise of those rights in light of the needs of the penal system. Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting. Turner v. Safley, 482 U.S. 78, 81, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A prison regulation or action is valid, therefore, even if it restricts a prisoner's constitutional rights if it is "reasonably related to legitimate penological interests." Turner, 482 U.S. at 89, 107 S.Ct. 2254. Turner sets forth four factors that courts should consider in making that determination. First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. Id. at 89-90, 107 S.Ct. 2254. Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Id. at 90, 107 S.Ct. 2254. Third, we examine whether an accommodation would have a "significant 'ripple effect' " on the guards, other inmates, and prison resources. Id. Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimus cost to valid penological interests." Id. at 90-91, 107 S.Ct. 2254.

>             *   *   *

> In analyzing [a free-exercise] claim, we consider the threshold issue of whether the challenged governmental action "infringes upon a sincerely held religious belief," Hamilton v. Schriro, 74 F.3d 1545, 1550 (8th Cir.1996), and then apply the Turner factors to determine if the regulation restricting the religious practice is "reasonably related to legitimate penological objectives." O'Lone v. Estate of Shabazz, 482 U.S. 342, 353, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). We accord great deference to the judgment and expertise of prison

> officials, "particularly with respect to decisions that implicate institutional security." Goff v. Graves, 362 F.3d 543, 549 (8th Cir.2004).

Murphy v. Missouri Dep't. of Corrections, 372 F.3d 979, 982-83 (8th Cir.), cert. denied, 543 U.S. 991 (2004).

While Jihad's First Amendment claims are actionable under 42 U.S.C. § 1983, he also raises a statutory free exercise claim under RLUIPA, as noted.   "By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims." Murphy, 372 F.3d at 986.  A prison policy that satisfies RLUIPA's strict scrutiny standard necessarily satisfies the rational basis test applied for First Amendment purposes.  Gladson v. Iowa Department of Corrections, 551 F.3d 825, 831 (8th Cir. 2009).  As such, where Jihad has raised both a Free Exercise and a RLUIPA claim, the Court has first addressed his claims under the framework of RLUIPA.

Section 3 of RLUIPA provides, in part:

> "(a) General rule
>
> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on the person-
>
>> (1) is in furtherance of a compelling governmental interest; and
>>
>> (2) is the least restrictive means of furthering that compelling governmental interest."

RLUIPA defines religious exercise as "any exercise of religion, whether or not compelled by, or

central to, a system of religious belief."   42 U.S.C. § 2000cc-5(7)(A). .

In order "to demonstrate a substantial burden on exercise of religion, a governmental policy or action must significantly inhibit or constrain religious conduct or religious expression; must meaningfully curtail a person's ability to express adherence to his or her faith; or must deny a person reasonable opportunities to engage in those activities that are fundamental to a person's religion." Van Wyhe, 581 F.3d at 656 [citations and quotations omitted].[4] "Only after the plaintiff first fulfills this duty must the government prove that its policy is the least restrictive means to further a compelling governmental interest." Weir v. Nix, 114 F.3d 817, 820 (8th Cir. 1997)(RFRA case); see also, Murphy, 372 F.3d at 987 (noting that courts look to RFRA cases for guidance on applying RLUIPA).

RLUIPA, which was enacted in 2000 after the United States Supreme Court found its predecessor statute unconstitutional as applied to the states in City of Boerne v. Flores, 521 U.S. 507 (1997), "is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." Cutter, 544 U.S. at 714.  Congressional history indicates that RLUIPA was intended to eliminate frivolous or arbitrary barriers to an institutionalized individual's religious exercise, albeit with the expectation "that courts entertaining complaints under § 3 would accord due deference to the experience and expertise of prison and jail

---

[4]      In an earlier case, see Murphy v. Missouri Dept. of Corrections, 372 F.3d 979, 987 (8th Cir. 2004), the Eighth Circuit stated that the religious conduct or expression must manifest a "central tenet" of the person's religious beliefs.  Consistent with the Supreme Court's decision in Cutter v. Wilkinson, 544 U.S. 709 (2005), the Eighth Circuit has since clarified that "'RLLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion.'" Gladson v. Iowa Department of Corrections, 551 F.3d 825, 832 (8th Cir. 2009), quoting Cutter, 544 U.S. at 725.

administrators." Id. at 716-17 [quotations and citations omitted].  As such, "[a]lthough we required the government to meet a higher burden than [under the First Amendment free exercise clause] . . . , we nevertheless accord[] a significant degree of deference to the expertise of prison officials in evaluating whether they met that burden." Murphy, 372 F.3d at 987 [citing cases].[5]

Lastly, in a prior order, the Court determined that RLUIPA does not permit claims against prison officials in their individual capacities because individual prison personnel do not themselves receive Federal funding.  (Dkt. 109, at pp. 40-42).  The Court continues to rely on this analysis, and therefore concludes that to the extent that Jihad has asserted claims pursuant to RLUIPA, those claims are against the named Defendants **in their official capacities only**.  As we have already concluded, Jihad cannot seek damages against Defendants in their official capacities, so his RLUIPA claims are for equitable relief only.

Jihad also claims that Defendants have violated his religious rights secured by Article 1, Section 16 of the Minnesota State Constitution.[6]  Defendants argue that these claims must be dismissed because Minnesota has not recognized a private cause of action for violations of the Minnesota Constitution.

---

[5]     "Although we give prison officials 'wide latitude within which to make appropriate limitations,' they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.'" Murphy, 372 F.3d at 988-89, quoting Hamilton v. Schriro, 74 F.3d 1545, 1554 (8th Cir.), cert. denied, 519 U.S. 874 (1996).

[6]     Article 1, Section 16 of the Minnesota Constitution states in relevant part: "The right of every man to worship God according to the dictates of his own conscience shall never be infringed; nor shall any man be compelled to attend, erect or support any place of worship, or to maintain any religious or ecclesiastical ministry, against his consent; nor shall any control of or interference with the rights of conscience be permitted, or any preference be given by law to any religious establishment or mode of worship. . ."

Minnesota has not enacted a statue that is equivalent to Section 1983, which provides a private cause of action for violations of the Federal Constitution. Guite v. Wright, 976 F. Supp. 866, 871 (D. Minn. 1997), aff'd on other grounds, 147 F.3d 747 (8th Cir. 1998); Mlnarik v. City of Minnetrista, 2010 WL 346402 at *1 (Minn. App. Feb. 2, 2010)(finding that "no private cause of action for a violation of the Minnesota constitution has yet been recognized" and therefore "appellant's complaint fails to state a claim"); Danforth v. Eling, 2010 WL 4068791 at *6 (Minn. App., Oct. 19, 2010)("there is no private cause of action for violations of the Minnesota Constitution"). As such, to the extent that Jihad attempts to assert claims under the Minnesota Constitution, these claims should be dismissed.[7]

1. Salat Claim Against Defendants Crist, King, Miles,, Skrypek, and Blackmon in their Official Capacities

Jihad argues that the above Defendants impermissibly burdened the practice of his religion when they denied his request to perform his five daily prayers in a location outside of his cell. Jihad argues that his religion forbids him from praying in the presence of a toilet, and as such, that Defendants' failure to accommodate his request has forced him to violate his religious beliefs by requiring him to conduct his daily prayers in the presence of a toilet.

---

[7] In any event, Jihad represents that he is not seeking damages for any claimed violations of the Minnesota Constitution, and consequently, any such claims are essentially subsumed within his RLUIPA and First Amendment free exercise claims. See, Hill-Murray Federation of Teachers, St. Paul, Minn. v. Hill-Murray High School, Maplewood, Minnesota, 487 N.W.2d 857, (Minn. 1992)(the test for a claim under the Minnesota freedom of conscience clause "has four prongs: whether the objector's belief is sincerely held; whether the state regulation burdens the exercise of religious beliefs; whether the state interest in the regulation is overriding or compelling; and whether the state regulation uses the least restrictive means").

For purposes of their summary judgment motions, Defendants have not challenged the sincerity of Jihad's religious beliefs with respect to salat, and they have assumed that the applicable restrictions impose a substantial burden on the practice of his religion.  As such, the Court has assumed, without deciding, that Defendants have substantially burdened Jihad's sincerely held religious beliefs as they relate to where he should perform his daily prayers.

Instead, Defendants contend that the policy restricting Jihad to his cell for his daily prayers is narrowly tailored to furthering a compelling governmental interest.  There can be no question that prison security and the safety of inmates and staff constitute compelling interests in the prison setting.  Goff v. Graves, 362 F.3d 543, 549 (8th Cir. 2004)("We must accord great deference to the judgment of prison officials, particularly with respect to decisions that implicate institutional security"); Murphy, 372 F.3d at 983 (8th Cir. 2004)("Institutional security is 'the most compelling interest in a prison setting.'")  In the present case, Jihad's requested accommodation would significantly increase the number of daily movements for Muslim inmates that would have to be monitored and regulated by DOC staff.  As Defendants have pointed out, this amounts to ten additional movements within the prison for every Muslim inmate involved.  As Defendants have stated, the logistical problems with such a request would be significant for DOC staff.  Moreover, allowing Muslim inmates to have substantially more opportunities to leave their cells and to utilize common areas would likely create the appearance of favoritism, thereby leading to discord and conflict among inmates.  All of these concerns plainly implicate the order and security of the prison.  See, Singson v. Norris, 553 F.3d 660, 663 (8th Cir. 2009)(finding that prison's security concerns were entitled to deference, and noting that "[a] prison is free to deny inmate religious requests

predicated on RLUIPA if they jeopardize the effective functioning of an institution."), quoting Cutter, 544 U.S. at 726.  As such, the Court finds that Defendants have clearly met their burden of establishing a compelling governmental interest in maintaining the order and security of the prison.[8]

Since the Court has determined that Defendants have established the existence of a compelling governmental interest, the Court must now determine whether there exists a less restrictive, suitable alternative that serves the government's compelling interests in maintaining prison security and order.  The Court finds that there is no suitable alternative that would permit Jihad to perform salat outside of his cell five times daily without significantly undermining the security and order of the facility.  There is simply no alternative that would not require extremely significant additional inmate movements in the facility.  Moreover, there is no way to accommodate Jihad's request to significantly increase his movements and access to common areas without extending the same accommodation to all Muslim inmates who could request it, and thereby also

---

[8] The Court finds that Jihad's attempts to dispute that Defendants have established a compelling interest do not adequately raise a genuine issue of material fact.  Jihad argues that Defendants' security concerns are "exaggerated and irrational" because inmates are permitted to leave their cells at irregular hours for work activities, and because there are only 15 Muslims who attend regular Sunday Islamic studies class.  (Pl.'s Memo. in Opp., Dkt. 175, at p. 5).  First, even if some inmates leave their cells at irregular hours, this does not address the frequency of movements, which is a significant aspect of Defendants' security concerns.  Also, this does not address concerns related to favoritism of Muslim inmates.  Moreover, to the extent that Jihad is implying that many Muslims should not be permitted to take advantage of the requested accommodation, such a request is clearly without merit.  The DOC would not be able to accommodate Jihad's request without accommodating similar requests from other Muslim inmates.  As such, the Court finds that this evidence does not competently dispute and therefore does not crease a **genuine** dispute of material fact as to the existence of a compelling governmental interest.

creating a potential appearance of favoritism and increasing conflicts among non-Muslim inmates. In addition, this would require the allocation of significant resources to only one religion and only a limited number of inmates when compared to the whole inmate population.

Defendants are not preventing Jihad from performing his salat altogether since he is clearly permitted to pray in his cell as frequently as he wishes. He has also been permitted to keep a prayer rug in his cell for this purpose. However sincere his belief, there is simply no reasonable way to accommodate Jihad's request without undermining the security and orderly administration of the prison. Simply put, prisons are not required to remove all barriers to an inmate's religions practice in the name of religious freedom. In the present case, the DOC's concerns are not arbitrary or irrational, but rather, they implicate one of the most fundamental aspects of the safety and security of a prison – namely, the strict regulation of inmate movements within the facility. See, Williams v. Jabe, 2008 WL 5427766 at *7-8 (W.D. Va., Dec. 31, 2008)(security concerns justified denial of request to have evening congregational prayers during Ramadan where the request would increase inmate movements during period of decreased staff availability), aff'd, 339 Fed.Appx. 317 (4th Cir. 2009), cert. denied, 130 S.Ct. 1061 (2010); Vega v. Lantz, 2009 WL 3157586 at *10 (D. Conn., Sept. 25, 2009) ("RLUIPA does not require officials to make the burdensome alterations to prison scheduling and facility use that the plaintiff seeks, particularly in light of the security concerns that the defendants identify", where inmate requested permission to conduct five daily congregational prayers); Fowler v. Crawford, 534 F.3d 931 (8th Cir. 2008)(prison was not required to provide sweat lodge for Native American inmate even though he believed it was necessary to the practice of his religion where such a request had clear implications for maintaining order and security even though

the facility had permitted sweat lodges in the past), cert. denied, 129 S.Ct. 1585 (2009); Singson, 553 F.3d at 662-63 (Wiccan inmate was denied request to keep tarot cards in cell for religious purposes where the court found "that the potential effect of in-cell use on the guards and allocation of prison resources outweighs the restrictions felt by any interested inmate-users."); Ahmad v. Ehrmann, 339 F. Supp.2d 1134, 1137-38 (D. Colo. 2004)(weekly group prayer was sufficient substitute for request to have five daily prayers in a room without a toilet because such a request would drain prison resources and the request would undermine security), reversed on other grounds, 435 F.3d 1196 (10th Cir. 2006).[9]

In sum, the Court finds that Defendants have demonstrated that their policy regarding Jihad's five daily prayers is narrowly tailored to serving a compelling governmental interest. Because Jihad's prayer claim does not survive under RLUIPA, his First Amendment claim must also fail.

---

[9]   The Court understands Jihad to argue that because he cannot perform salat outside the presence of a toilet, he is not being offered suitable or reasonable alternatives to practice his faith because he cannot practice in the exact manner that he believes is required by his religion. Jihad appears to misconstrue the requirements of RLUIPA and the First Amendment. A sincere belief that an activity is necessary or central to the practice of a religion does not, by itself, establish that a prison must accommodate an inmate's request. See Gladson, 551 F.3d at 831 ("a prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so"); Cutter, 544 U.S. at 722 (RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety.") In other words, the prison must afford a reasonable opportunity to Jihad to practice his religion, but that does not mean that a prison must accommodate every religious belief as to the manner, location, and frequency of religious practices. Prisoners must practice their religions within certain boundaries and rules that are necessary to the overall order and security of the facility. In this case, those interests must override Jihad's personal beliefs as to the manner and location he would prefer for the performance of his daily prayers.

Therefore, the Court recommends that Jihad's salat claim be dismissed with prejudice, and that summary judgment be entered in favor of Defendants Crist, King, Miles, Julson, Skrypek, and Blackmon as to this claim.

2.    Halal Meals Claim Against Defendants Fabian, Smith, and Reishus

Jihad argues that Defendants are violating his religious rights by failing to provide him with certified halal meals.  This claim is asserted against Defendants Fabian, Smith, and Reishus.[10]

"Halal" refers to what is permissible or lawful under Islamic law, while "Haram" refers to what is forbidden or unlawful.  (Dkt. 39-4).  The parties agree that the primary feature of a halal diet is the absence of pork, which is forbidden.  However, the parties do not agree on what is required of a halal diet.  According to Defendants, a halal diet primarily requires the absence of pork and alcohol.  (Packwood Aff., Dtk. 167, at ¶ 7).  Based on this understanding, Defendants claim that

---

[10]    In their Reply, Defendants argue that Jihad has not exhausted his administrative remedies with respect to cross-contamination issues in the DOC's kitchen.  Defendants raised this argument for the first time in their Reply Brief, and the Court generally does not consider arguments made for the first time in a reply.  Britton v. Astrue, 622 F.Supp.2d 771, 790 (D. Minn. 2008); Bearden v. Lemon, 475 F.3d 926, 930 (8th Cir. 2007)("This claim was not argued in Lemon's brief in chief and, therefore, we will not consider the argument as it is well settled that we do not consider arguments raised for the first time in a reply brief").  Accordingly, the Court finds that the issue has not been adequately briefed.  In any event, the Court does not consider the cross-contamination issue to be dispositive of the halal meals issue, since Defendants have failed to carry their burden of establishing that their refusal to accommodate Jihad's request was narrowly tailored to serve a compelling governmental interest.

Moreover, to the extent that Defendants argue the Court's March 30, 2010 Order on his motion to amend (Dkt. 109) has precluded any claims against Reishus, the Court disagrees.  The Court understands Jihad to assert only a halal meals claim against Reishus, and Jihad was granted leave to assert his halal meals claim by a later Court Order.  (Dkt. 117).

Jihad is able to eat a halal diet with the food options that are available at MCF-Stillwater, since existing DOC meal options permit him to eat a diet entirely free of pork.  Therefore, Defendants argue, Jihad has not established a substantial burden on the practice of his religion.

In support of their argument, Defendants have offered the affidavits of DOC staff who have consulted generally with the Muslim population in order to become familiar with the religion and what is required of a halal diet.  In particular, Defendants have offered the Affidavit of Joseph Hobson, who serves as the religious coordinator at MCF-Stillwater.  Hobson's own religious affiliation is with the Seventh-day Adventist Church. (First Hobson Aff., at ¶ 2).  Hobson states that he become "particularly familiar with the Islamic faith through self-study and contacts with the Muslim population."  (Id.)  Hobson represents that "[e]verything that is not unlawful is halal, and only a few foods are haram", and that "[a]ll food is considered lawful unless explicitly forbidden." (Id. at ¶ 6).  As such, Hobson avers that Muslims may eat any food item that is not haram, and that the main food that is considered haram is pork.  (Id.)  Because meal options at MCF-Stillwater always contain pork-free options, Hobson states that inmates may follow a halal diet based on the meal options that are already available.  (Id. at ¶ 7).

Defendants have also offered the Affidavit of Sheila Packwood, who has worked as a dietitian for the DOC since 2004 and who is not Muslim.  (Packwood Aff., at ¶ 1).  According to Packwood, MCF-Stillwater provides two meal options, a standard meal and a lacto-ovo vegetarian meal.[11]  (Id. at ¶ 4).  Although not addressed by Defendants, it appears that DOC policy also

---

[11]     The lacto-ovo vegetarian meal is "a non-meat alternate meal using dairy products, eggs, and legumes to provide adequate protein and nutrition."  (Dkt. 31-1, at p. 1 of 7).

provides for a "Kosher Vegetarian Meal," which are pre-packaged meals that are purchased through an approved vendor and which are available through a facility religious coordinator.[12]  (Dkt. 31-1, at p. 3 of 7).  DOC staff encourage inmates with a food allergy, religious preference, diabetes, hypertension, or other medical issues to choose the vegetarian meal, although the choice is ultimately left to the inmate.  (Packwood Aff., at p 4).  In addition, about five inmates at MCF-Stillwater receive a special food tray that is not a standard or vegetarian meal because they have "a medically justified reason for receiving a special tray."  (Id. at ¶ 5).  For instance, some of these inmates are in renal failure, require a low-protein diet, or have a gluten intolerance.  (Id.)  Packwood states that under these circumstances the five inmates who receive special trays would not be able to self-select a nutritionally safe meal from the regular meal options.  (Id.)

Packwood indicates that she has researched halal meals on several occasions by consulting with community resources volunteers, staff at halal markets, the executive director of the Islamic University of Minnesota, other Muslims, and other dietitians in the corrections field.  (Id. at ¶ 6).  Packwood states that, based on her research, Jihad's understanding of halal does not represent the "common understanding of the term."  (Id. at ¶ 7).  According to Packwood, the most important aspect of a halal diet is "not to consume any part of a pig or any alcohol."  (Id.)  Packwood states that inmates may eat a halal diet through the meals that are already offered.  (Id. at ¶ 8).  According to Packwood, nearly all of the individuals she consulted with were "surprised" by the definition of

---

[12]     In response to one of Jihad's grievances, a DOC Staffperson named Nanette Larson states that kosher meals are only provided during the observance of Passover.  (Dkt. 111-1, at p. 3 of 21).  None of the Affidavits submitted by Defendants have addressed this issue directly, and consequently, it is unclear how often kosher meals are provided to Jewish inmates.

halal that Jihad was advancing.  (Id. at ¶ 7).  She also states "[t]hey explained to me that even a product certified as halal would not necessarily satisfy the definition advanced by Jihad."  (Id.) Packwood stated that most Muslims are not concerned with the way that fruits and vegetables are grown, and that fruits and vegetables are generally acceptable regardless of the way they are grown so long as they are washed before eating.  (Id.)  Hobson also indicates that Jihad's definition of halal is "an extreme view" based on his consultation with other lifetime Muslims.  (Second Hobson Aff., at ¶ 6).  Hobson also states that if halal food is not available, "a Muslim may pray over and then eat it."  (Id.)

Packwood discloses that she looked into  the possibility of obtaining prepackaged halal meals, but that she found that it would not be feasible due to costs and nutritional requirements.  (Id. at ¶ 8).  Packwood priced prepackaged certified halal meals over the internet through Good Source Solutions, Inc., a California food vendor that services correctional facilities throughout the country. (Id.)  According to Packwood, a certified halal meal is approximately $3.50 to $4.00 per meal, but the meal only provides 400 calories, as compared to the 1,000 calories for a standard DOC meal. (Id.)  As such, in order to meet nutritional and caloric requirements, an inmate would likely need two or three pre-packaged meals for each meal.  (Id.)  Packwood states that a regular DOC meal costs approximately $1.10 to $3.29 per day for each inmate, and that it would be cost-prohibitive to spend $7.00 to $12.00 per meal to obtain sufficient halal-certified meals.  (Id.)  Packwood also stated that supplementing these meals with fruits, vegetables and bread would also not be sufficient because these items would not meet Jihad's definition of halal.  (Id.)  According to Packwood, the prepackaged meals only offer ten options, so meal variety would be substantially reduced.  (Id. at

¶ 9).

Jihad maintains that the DOC's understanding of what is considered halal is not accurate. As the Court understands Jihad's argument, in order to be considered halal, any food consumed must not come into contact with pork at any stage.  In other words, a halal diet requires that he not only refrain from eating pork and pork by-products, but that he also refrain from eating any meat that derives from an animal that was fed with a pork by-product, or fruits and vegetables that were grown in a soil fertilized with manure.  In addition, Jihad claims "Halal is achieved through Islamic rituals in accord with the Qur'an."  (Pl.'s Memo. in Opp., Dkt. 175, at p. 6). The Court understands Jihad to argue that the current meal options, even though they do not contain pork, require him to consume foods that violate his religious beliefs, and that the only suitable option is the provision of halal-certified meals.

As an initial matter, Defendants question the sincerity of Jihad's beliefs.  (Pl.'s Memo. in Supp., Dkt. 163, at p. 19).  To the extent that Jihad's understanding of halal is not necessarily the most common or orthodox understanding of the term, the Court notes that "'the guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect.'"  Love v. Reed, 216 F.3d 682, 688 (8th Cir. 2000), quoting Thomas v. Review Board of the Indian Employment Security Division, 450 U.S. 707, 715-16 (1981).  Moreover, whether or not an asserted belief constitutes "a sincerely held religious belief is a factual determination, so we must not quickly dismiss such claims on summary judgment by concluding that those beliefs are not genuine." Murphy, 372 F.3d at 983, citing Ochs v. Thalacker, 90 F.3d 293 F.3d 293, 296 (8th Cir. 1996). While there may be some cause to believe that Jihad's request may not be entirely sincere, this is

a factual dispute that cannot be resolved on summary judgment.  As such, the Court concludes that there are genuine issues of material fact, which preclude any conclusions as to the sincerity of Jihad's beliefs.

Next, the Court also concludes that there are genuine issues of material fact regarding whether the DOC's meal policy imposes a substantial burden on the practice of Jihad's religion. The case law makes clear that where a prison policy causes an inmate to violate some religious belief or tenet, that policy generally constitutes a substantial burden on religious practice.  See, Waff v. Reisch, 2010 WL 3730114 at *9 (D. S.D. July 30, 2010)(discussing definitions of substantial burden and noting that religious exercise will be substantially burdened if prison pressures or forces an inmate to engage in conduct that violates his religious beliefs).  Here, Jihad has shown that he believes that eating a halal diet requires more than merely avoiding pork products.  In particular, he has indicated that his religious beliefs compel him to eat food that has been grown, produced and processed in a particular manner, and that to ensure that food meets his religious needs, it must be certified as halal.

Defendants attempt to counter Jihad's claim of substantial burden by establishing that a halal diet is primarily achieved by the absence of pork in the diet.  Jihad does not dispute that pork is a main concern with respect to halal diets.  However, he disputes that this is an accurate representation of the true nature of a halal diet.  The Court finds that Defendants have failed to offer competent evidence at this time in support of their understanding of halal, and therefore, they have failed to establish for purposes of the present summary judgment motion only that their existing meal plans are religiously adequate as a matter of law; a dispute of fact remains based on the present record.

The individuals who have described the definition of halal do not identify as Muslim, and their description of the meaning of a halal diet is hearsay based on their discussions with unidentified Muslims in the community.  Federal Rule of Civil Procedure 56(c) provides that affidavits offered in support of motions for summary judgment must be based on personal knowledge and must set forth facts as would be admissible in evidence.  The affidavits attesting to what some unidentified Muslims say is the meaning of a halal diet are based on hearsay, which is not a proper basis for supporting Defendants' summary judgment motion.  Brewster v. United States, 860 F. Supp. 1377, 1385 (S.D. Iowa 1994)(noting that hearsay evidence shouldn't be considered on a motion for summary judgment).

Consequently, the Court is unable to conclude, in the absence of admissible and competent evidence, that the meal options available at MCF-Stillwater do not cause Jihad to consume food that is in violation of his religious beliefs.  Therefore, the Court finds that fact issues still remain regarding whether the meal policy substantially burdens Jihad's religious beliefs.[13]  See, Thompson v. Williams, 2007 WL 3244666 *17-20 (W.D. Wash., Oct. 31, 2007)(finding summary judgment in favor of defendants was not warranted where plaintiff had shown eating a halal diet including meat is a fundamental tenant of his faith while prison officials failed to show that meal options were religiously adequate or that providing them would be too burdensome); Baranowski v. Hart, 486 F.3d 112, 125 (5th Cir. 2007)("Given the strong significance of keeping kosher in the Jewish faith,

---

[13]     Moreover, even if the Court were to credit Defendants' evidence describing the definition of a halal diet, this does not necessarily establish that Jihad's religious beliefs are not substantially burdened, since it is his beliefs that are at issue.  As the Court has already stated, the inquiry is not framed in terms of whether the prison's policy or conduct imposes a substantial burden based on the common understanding of the religion.

the [prison's] policy of not providing kosher food may be deemed to work a substantial burden upon Baranowski's practice of his faith").

Turning to the last steps, the Court also concludes that Defendants have failed to show that their meal policy is narrowly tailored to achieving a compelling governmental interest.  Defendants argue that they explored the option of obtaining prepackaged halal meals, but found that the meals significantly exceed the DOC's budget for meals.  The Court finds that Defendants have failed for purposes of the present motion to adequately support this argument with sufficient evidence.  The burden of establishing that a policy is narrowly tailored to achieving compelling governmental interests rests with the prison officials.  Prison officials "must demonstrate that they actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." See, Fegans, 537 F.3d at 910, quoting Alvarez v. Hill, 518 F.3d 1152, 1156 (9th Cir. 2008).  In this instance, the only evidence that Defendants considered less restrictive alternatives is based on Packwood's review of pricing information available on only one website: the Good Source Company.  There is no evidence that Defendants attempted to obtain pricing information from any other food service companies, and they have offered no evidence to suggest that the Good Source company is the only company that offers certified halal meals.  The Court finds that Packwood's inquiry was  arbitrary and self-serving, and consequently, the Court cannot conclude that Defendants reasonably considered less restrictive alternatives based on their review of only one website.  See, Thompson v. Williams, 2007 WL 3244666 at *19 (summary judgment was not warranted where prison officials had failed to meet their burden of establishing that their meal policy was the least restrictive means of serving compelling governmental interests).  However, the Court

is also unable to conclude that Jihad is entitled to summary judgment on his claim, since there are genuine issues of material fact that remain.

While the Court has determined that Jihad's RLUIPA claim should be permitted to move forward at this juncture, there is one final issue to be resolved as to Jihad's halal meal claim.  The Court finds that even though Jihad's RLUIPA claim may move forward, Defendants are entitled to qualified immunity as to his First Amendment claim for damages in their individual capacities. "Qualified immunity generally shields 'government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Williams v. Jackson, 600 F.3d 1007, 1012 (8th Cir. 2010), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Although the Court is unable to find at this time that the DOC's denial of the requested accommodation will ultimately be affirmed as valid, the Court finds that their actions did not violate clearly established constitutional law of which a reasonable person would have known.  See e.g., Thompson v. Williams, 2007 WL 3244666 at *22 (W.D. Wash. 2007)(genuine issues of material fact existed on First Amendment and RLUIPA claims, but finding defendants entitled to qualified immunity because "the majority of circuit and district courts that have looked at this specific issue have concluded there is no such clearly establish right to Halal meals, with or without Halal meat, under the First Amendment's Free Exercise of Religion Clause, RLUIPA or the Equal Protection Clause of the Fourteenth Amendment.")  Although there is a clearly established right to religious dietary accommodations, the Court finds that, based upon a review of the cases, there is no clearly established right to pre-packaged halal meals.  See e.g., Patel v. United States Bureau of Prisons,

515 F.3d 807  (8th Cir. 2008)(BOP was not required to provide halal meals under the facts of that

case); <u>Pratt v. Corr. Corp of Am.,</u> 267 Fed.Appx. 482 (8th Cir. 2008)(prison not required to provide

diet with halal meat where other food that was halal was provided).  In this case, the critical issue

that remains to be resolved is whether the DOC did enough to consider other alternatives that would

accommodate Jihad's religious beliefs.  While, without deciding now, the DOC may ultimately have

to consider providing prepackaged halal meals, once the disputes of material fact are resolved, this

does not preclude the availability of qualified immunity.  In this case, the Court cannot say that there

is a clearly established right to prepackaged halal meals based on religious beliefs.   As such, the

Court finds that Jihad cannot proceed on his individual capacity claims against the Defendants, and

all that remains are official capacity claims.

In sum, as to Jihad's halal meals claim, the Court recommends that Defendants' motion for

summary judgment be denied in part and granted in part, and that Jihad's motion for summary

judgment also be denied.  Jihad should be permitted to further pursue his halal meals claim against

Defendants Fabian, Smith, and Reishus in their official capacities only.

### 3.   Holiday Meals Claim

Jihad argues that Defendants have violated his free exercise rights by limiting him to one

special holiday meal per year.  The Court understands Jihad to request that he be allowed to

celebrate Eid-al-Ahda at the conclusion of Hajj with a "religious feast."   (Pl.'s Memo. in Opp., at

p. 30).  Defendants argue that the DOC's policy limiting Jihad to only one special feast per year does

not impose a substantial burden on the practice of his religion.  Defendants further argue that even

if Jihad could establish a substantial burden on the practice of his religion, the DOC's policy is narrowly tailored to achieve a compelling state interest.

The Court finds that Jihad has not shown that the practice of his religion is substantially burdened by the one special meal policy.  Significantly, the Eighth Circuit has stated that a "prison must permit reasonable opportunity for an inmate to engage in religious activities but **need not provide unlimited opportunities.**"  Van Wyhe, 581 F.3d at 657 [emphasis supplied].  The DOC has produced competent evidence that Jihad may fast according to his religious beliefs at any time during the year, including during Hajj, and he is not prevented from pursuing individualized prayer and worship in the absence of the requested special meal.  In other words, Jihad has not been prevented from celebrating Eid-al-Ahda altogether; rather, he has been prevented from recognizing the religious holiday in his preferred manner, with a special meal.  As a consequence, the Court finds that Jihad cannot show that the practice of his religion has been substantially burdened by the rule limiting religious feasts to one per year.  See, Gladson, 551 F.3d at 831  ("a prisoner need not be afforded his preferred means of practicing his religion as long as he is afforded sufficient means to do so"); Johnson v. Harmon, 2005 WL 1772752 at *16 (E.D. Ark., July 1, 2005)(religious exercise was not substantially burdened simply because inmate was not able to participate in catered Eid Feast, and finding that inmate was able to break the fast of Ramadan by eating his regular meal tray "with the mind set and prayerfulness that is the essence of that religious holiday"); Muhammad/Smith v. Freyder, 2007 WL 1116045 at *3 (E.D. Ark. April 12, 2007)(finding that inmate's rights were not violated when he was not permitted to participate in the Eid feast, but was served regular meal tray, because he was in administrative segregation).

Moreover, even if the one special meal policy substantially burdened the practice of Jihad's religion, the Court would nevertheless find that the DOC's policy meets the strict scrutiny standard applicable under RLUIPA.  First, the Court finds that the policy furthers compelling governmental interests.  The religious meal policy applies to all religious groups, and therefore, it promotes the equal treatment of all inmates and furthers the interest of preventing the perception of favoritism and thus minimizing the potential for inmate conflict.  Id. at *5 (policy prohibiting inmate from receiving catered Eid meal was justified because serving catered food to an inmate in segregation would create the impression of favoritism).  Moreover, allowing more than one special meal would impose additional burdens financially and with respect to staffing, as Defendants have detailed.

The Court recognizes that Jihad has submitted evidence showing that Muslim inmates are involved in the preparation of the Eid-al-Fitr meal, presumably to establish that Defendants' staffing concerns are overstated.  However, even if Muslim inmates prepare the special meal, this does not address the staffing and financial burdens that would be imposed by allowing all religious groups to have more than one special meal per year.  Defendants would have to consider permitting additional special meals for all religions and, as Defendants have established, many other religious groups would likely request such an accommodation given the benefits of the special meals.  Most importantly, Defendants have established that the policy also provides for the equal treatment of all religious groups, which prevents instances of inmate conflict based on perceived favoritism.  Accordingly, the Court finds that Defendants have demonstrated compelling governmental interests in uniformly limiting all religious groups to one special meal per year.

The Court also finds that there is no dispute that the policy is the least restrictive means of

serving these interests.  First, allowing Jihad personally, or Muslims in general, an exemption from this policy would likely result in perceptions of favoritism  and, ultimately, could result in inmate conflict.  Defendants cannot simply eliminate inmate conflict by permitting all religious groups to have two or more feasts per year, because this would result in significant burdens financially and administratively.  Likewise, to the extent that Jihad offers to pay personally for the cost of the Eid-al-Ahda feast, this does not remedy the additional problems that would result with inmate conflict or DOC staffing, and therefore, it is not a suitable alternative.[14]  As a result, there is no way to meet Jihad's request without risking security and without imposing significant financial and administrative burdens.          In sum, Jihad has failed to establish a violation of his religious rights, and therefore, Defendants are entitled to summary judgment on Jihad's special meal claim.[15]

4.    Religious Apparel Claim Against Defendant Fabian

Here, Jihad challenges the portion of DOC Policy No. 302.30 that prevents him from wearing

---

[14]    The policy itself expressly prohibits inmates from contributing to the cost of the religious feasts, and Defendants have not attempted to explain the basis for that rule.  As such, the Court has not relied on it in making its decision.

[15]    To the extent that Jihad may also be attempting to assert a claim that he should be permitted to fast during Hajj, or celebrate Eid-al-Ahda in a particular manner, these claims clearly fail.  First, Jihad has not brought forth any evidence to demonstrate that he requested and was denied the opportunity to fast during Hajj, and the evidence shows that he may fast for religious purposes at any time during the year.  Moreover, there is no evidence that the DOC ever denied a request that Muslim inmates be permitted to participate in a group prayer, or some other religious activity in recognition of the holiday for the celebration of Eid-al-Ahda, except insofar as Jihad requested permission to celebrate with an additional special meal.  Without any such evidence, Jihad would be unable to establish a substantial burden, and Defendants would clearly be entitled to summary judgment.

his kufi while he is outside of his cell or the chapel.  Jihad alleges that this policy violates his free

exercise rights by prohibiting him from wearing his kufi when he is in the public eye.  According

to Jihad, Muslims are required to guard their modesty by covering their head while in the public eye.

(Pl.'s Memo. in Opp., at p. 33).  Jihad further states that "[a] kufi is a common head covering cap

that Muslims use to cover their heads."  (Id.)

The Court finds that Jihad's kufi claim should be dismissed because he has failed to establish

a substantial burden on the practice of his religion.  Significantly, the DOC policy at issue does not

entirely prohibit Jihad from covering his head while in the in public eye; rather, it only prohibits him

from wearing his personally preferred headwear outside of the chapel or his cell.  While Jihad claims

that his religious beliefs require him to cover his head in public in the interests of modesty, he has

not established that not being allowed to wear a kufi, as opposed to the readily available state-issued

headwear, substantially burdens his religious exercise.  See, Junaid v. Kempker, 2009 WL 881311

at *8 (E.D. Mo., Mar. 27, 2009)(policy restricting religious headwear to religious activities and

outdoors did not impose substantial burden); Rogers v. Scurr, 676 F.2d 1211, 1216 (8th Cir. 1982)

("We find that no constitutional right of the prisoners was violated by the prohibition on wearing

prayers caps and robes outside religious services").  According to Jihad's own representations, his

primary concern is being able to cover his head in public, and the record is clear that he is not

prevented from doing this.  Further, and most importantly, he makes **no** claim that the state-issued

headgear is not adequate for religious reasons.  As such, the practice of his religion is not

substantially burdened under these circumstances.

Moreover, even if the policy prohibiting him from wearing his kufi outside of designated

areas did constitute a substantial burden on the practice of his religion, the Court would nevertheless conclude that the policy is narrowly tailored to further a compelling governmental interest. The compelling interests of prison safety and security justify these narrowly-tailored regulations, which prohibit Jihad from wearing a kufi outside of his cell, but allow him to freely wear his kufi while in his cell or at the chapel.  Charles v. Frank, 101 Fed.Appx. 634, 636 (7th Cir.)(regulation prohibiting prayer beads outside cell did not violate RLUIPA even though most Muslims would view the practice as essential to their faith), cert. denied, 543 U.S. 980 (2004); Jonas v. Schriro, 2006 WL 2772641 at *5 (D. Ariz., Sept. 25, 2006)(compelling interest in security and discouraging gang affiliation justified policy restricting the locations where religious headwear could be worn); Young v. Lane, 922 F.2d 370, 375-76 (7th Cir. 1991)(prison officials have a "strong interest in uniform dress regulations," "modern-day courts recognize that gangs pose a serious challenge to . . . institutional security," and "gangs try to identify their members by means of such visual aids as hats").  Here, Defendants have clearly established that their policy is narrowly tailored to serving institutional safety and security, which is furthered by requiring that inmates have a uniform appearance.[16]

In sum, the Court finds that Jihad's religious beliefs and practices are not substantially burdened, and that the policy in question is narrowly tailored to serve a compelling governmental interest.  As such, Defendants are entitled to summary judgment on this claim, and the Court

---

[16]     Jihad makes a few vague references to a religious medallion he wishes to wear. DOC regulations do not prohibit him from wearing the medallion, but require that the medallion be worn inside his shirt on a plastic cord while outside of his cell.  To the extent that Jihad continues to assert a claim based on the ability to wear a religious medallion, such a claim should be dismissed for the same reasons that his kufi claim fails.

recommends that Jihad's religious apparel claim be dismissed with prejudice.

### 5. Volunteer Requirement Against Fabian and Smith

Jihad also claims that Defendants Smith and Fabian violated his free exercise rights by requiring that a volunteer be present for religious services, and by cancelling services when no volunteer was available.

Significantly, in ruling on Jihad's earlier motion to amend, the Court denied as futile a motion to amend to assert RLUIPA and Free Exercise claims against certain Defendants, because Jihad had not sufficiently alleged a substantial burden on his religious practice as a result of the volunteer requirement. (Dkt. 109, at pp. 37-39). Defendants argue that summary judgment should be granted in their favor for the same reasons.

Initially, the Court again finds that Jihad has not demonstrated that the volunteer requirement imposes a substantial burden on the practice of his religion. There is no dispute that Jumu'ah services have been cancelled due to the lack of an available volunteer, and that attendance of the Jumu'ah service is an important aspect of the practice of his religion. However, the evidence demonstrates that Jumu'ah services are not prohibited, and that when the Muslim population increased, prison officials increased the number of services in order to accommodate weekly services for all Muslim inmates, albeit provided a volunteer was present. Defendants have also clearly demonstrated that Jihad is provided many other opportunities to personally practice his religion on a daily and weekly basis. As such, the Court finds that even if the volunteer requirement

results in the occasional cancellation of religious services, the policy is not a substantial burden on

Jihad's religious practice so long as there are other reasonable opportunities available for practicing

his religion.  See, Anderson v. Harron, 2009 WL 2058863 at *5 (D. N.J., July 7, 2009)(inmate could

not establish that absence of religious services was a substantial burden on exercise of religion

because religious services were not prevented because of an outright prohibition but due to a lack

of volunteers, and he could pray alone or with members of his pod when services were cancelled);

Harris v. Moore, 2007 WL 4380277 (E.D. Mo., Dec. 13, 2007)(no substantial burden where inmate

was limited to one group service per week lasting one and half hours), aff'd, 347 Fed.Appx. 271,

272 (8th Cir. 2009); Adkins v. Kaspar, 393 F.3d 559, 571 (5th Cir. 2004)(no substantial burden

where worship services were cancelled on numerous occasions due to "a dearth of qualified outside

volunteers available . . . not from some rule or regulation that directly prohibits such gatherings"),

cert. denied, 545 U.S. 1104 (2005).

Although Jihad has not shown a substantial burden on his religious exercise, his claim also

fails because Defendants have adequately demonstrated that the volunteer requirement is the least

restrictive means of furthering compelling governmental interests.  Defendants have detailed that

the volunteer requirement has been implemented in order to prevent inmates from serving in

supervisory positions over other inmates, so as to prevent potential conflicts through the creation

of hierarchies among inmates.  Courts have recognized that prison officials have an interest in

preventing unsupervised group activities and preventing inmates from holding leadership roles

within a religious group, in order to maintain security and discipline within the prison.  Shabazz v.

Arkansas Dept. of Corr., 157 Fed. Appx. 944, 945 (8th Cir. 2005)(prison had security interest in

avoiding inmates being elevated to position of leadership); <u>Cooper v. Tard</u>, 855 F.2d 125, 129 (8th Cir. 1988)(recognizing that prison has interest in prohibiting Muslim group from conducting unsupervised religious services); <u>Tisdale v. Dobbs</u>, 807 F.2d 734, 738 (8th Cir. 1986)(volunteer policy did not violate rights where unsupervised group prayers posed danger of "becoming forums for dissension and unrest"); <u>Smith v. Kyler</u>, 295 Fed. Appx. 479, 483-84 (3rd Cir. 2008)(volunteer requirement did not violate religious rights since inmate was able to practice his religion in other ways and where policy is meant to promote security and prevent authority structure among inmates), cert. denied, 129 S.Ct. 2837 (2009). Defendants have established that the volunteer policy in this case is also the least restrictive means of furthering this compelling interest.

Jihad argues that the policy is not narrowly tailored because the religious services could be supervised by COs when a volunteer is not present.  However, Defendants have offered evidence that requiring COs to supervise religious services is not a suitable alternative, because it would alter their fundamental relationship with inmates.  Such an accommodation would create a dual role for COs, requiring them to handle security concerns and to facilitate religious services at the same time. In addition, COs are not suitably qualified religious advisors, and as such, this would not prevent the creation of hierarchies among inmates of the gathered religion.  Therefore, the Court finds that the volunteer policy is narrowly tailored to further a compelling governmental interest.

For these reasons, the Court recommends that summary judgment be granted in favor of Defendants and that Jihad's volunteer claim be dismissed with prejudice.

6.      <u>Equal Protection Claims Against Smith and Fabian</u>

Lastly, Jihad alleges that Fabian and Smith violated his right to equal protection by depriving him of the right to attend Jumu'ah when a volunteer was not present.  In addition, Jihad claims that Defendants violated his equal protection claims when she cancelled Jumu'ah services on the July 4, 2009 holiday, and other State-recognized holidays even though volunteers were available, yet allowed non-religious programming to go forward.  (Pl.'s Reply, Dkt. 190, at p. 11).  The Court finds that Jihad's claims have no merit, and therefore, that Defendants are entitled to summary judgment on this claim.[17]

In the prison context, "[t]he heart of an equal protection claim is that similarly situated classes of inmates are treated differently, and that this difference in treatment bears no rational relation to any legitimate penal interest."  Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998), citing Timm v. Gunter, 917 F.2d 1093, 1103 (8th Cir. 1990), cert. denied, 501 U.S. 1209 (1991).  To assert an equal protection claim based on religion, inmates must show that he is "denied a reasonable opportunity to pursue their faith as compared to inmates of other religions."  Runningbird v. Weber, 198 Fed.Appx. 576, 578 (8th Cir. 2006).  "[P]rison officials may restrict the religious practices of inmates only if such deprivation is necessary to further legitimate penological interests."  Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999)[citations omitted].  Nevertheless, "in prison cases, courts will ordinarily defer to the expert judgment of prison authorities, due to the difficulty of running a

---

[17]   The Court recognizes that Jihad has cited to a provision of RLUIPA dealing with land use regulations:  "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1).  This provision has no relevance to Jihad's equal protection claim.  To the extent that Jihad has raised RLUIPA claims – which cannot be premised on this land use provision – those claims have already been addressed by the Court.

prison and the commitment of the task to the responsibility of the legislative and executive branches."  Id.

We begin our analysis by asking whether Jihad has shown that he has been treated differently than other similarly situated individuals when it comes to their respective religious practices.  See, Klinger v. Dep't of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995).  Religion constitutes a suspect classification.  Patel, 515 F.3d at 816, citing Weems v. Little Rock Police Dep't, 453 F.3d 1010, 1016 (8th Cir. 2006), cert. denied, 550 U.S. 917 (2007).  In this case, the Court finds that Jihad has not shown that he was treated differently than other similarly situated inmates, because the conduct and policies that he complains of apply equally to adherents of all religions within MCF-Stillwater.  See, Aziz v. Groose, 74 F.3d 1243 (8th Cir. 1996)("Everything about which Aziz complains applies to adherents of all other religions"; accordingly, "there was no equal protection violation"); Rouse v. Benson, 193 F.3d 939, 943 (8th Cir. 1999)("[plaintiff] has not presented this court with any evidence showing that other inmates following other religions have not been similarly limited").  Significantly, the evidence plainly demonstrates that the cancellation of religious services on State holidays applies the same to **all affected** religious programming, and the policy requiring volunteers to be present for religious services also applies the same to all religious services, regardless of the religion.  Therefore, Jihad has not presented any basis for establishing a violation of his right to equal protection.

The Court is mindful that Jihad argues that he has been treated differently than other similarly situated inmates because non-religious institutional programming, such as sports, was not cancelled when religious programming was cancelled, and because sports teams may be led by an

inmate leader.  (Pl.'s Memo. in Opp., at p. 14).  Even if we accept this as true, this is not sufficient

to establish an equal protection violation because Jihad must show that he was treated differently

than another religious group or sect.[18]   See e.g., Cooper v. Tard, 855 F.2d 125, 130 (3rd Cir.

1988)(finding no equal protection violation because the regulation made no distinction based on

religious group or sect and concluding that sporting events are fundamentally different than religious

activities); Burks-Bey v. Stevenson, 328 F.Supp.2d 928, 936 (N.D. Ind. 2004)("The Fourteenth

Amendment requires that the religious rights of inmates belonging to minority or nontraditional

sects be respected to the same degree as the rights of those belonging to larger and more traditional

denominations"); Aziz, 74 F.3d at 1243 (summary judgment properly granted on prisoner's equal

protection claim because restrictions on religious practice applied to followers of all religions).

Moreover, Jihad must show that the Defendants' differential treatment "was motivated by

intentional or purposeful discrimination."  Patel, 515 F.3d at 816, citing Lewis v. Jacks, 486 F.3d

1025, 1028 (8th Cir. 2007), and Phillips v. Norris, 320 F.3d 844, 848 (8th Cir. 2003).  Here, there

is no indication whatsoever that Defendants acted with the intent or purpose of discriminating based

on religion.

Accordingly, for the reasons stated above, Jihad's equal protection claim against Smith and

Fabian fails, and the Court finds that summary judgment in their favor should be granted.

7.    Motion to Dismiss of Defendants Blackmon and Srkypek

---

[18]    To the extent that Jihad continues to argue to his rights were violated because Jumu'ah
services were cancelled in favor of a "religious" holiday, this argument has already been rejected
by the Court.  The holidays at issue are clearly recognized as secular holidays. See, Jihad v. Fabian,
680 F.Supp.2d 1021, 1042 (D. Minn. 2010).

On August 12, 2010, Defendants Blackmon and Skrypek filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), which is now also before the Court.  (Dkt. 144).  In their motion, Blackmon and Skrypek argue that the Court lacks personal jurisdiction over them because Jihad failed to properly serve them with a copy of his complaint.

As an initial matter, Blackmon has since made an appearance and filed a motion for summary judgment in this action.  (Dkts. 160, 162).  Therefore, it will be recommended that as to Blackmon the motion be denied as moot.

Federal Rule of Civil Procedure 4 requires that a plaintiff serve a copy of the summons and complaint on defendant.  Generally, this must be done within 120 days, although the Court may extend this deadline for good cause.  Fed. R. Civ. Pro. 4(m).  "If a defendant is improperly served, a federal court lacks jurisdiction over the defendant."  Printed Media Services, Inc. v. Solna Web, Inc., 11 F.3d 838, 843 (8th Cir. 1993), citing Dodco, Inc. v American Bonding Co., 7 F.3d 1387, 1388 (8th Cir. 1993), and Sieg v. Karnes, 693 F.2d 803, 807 (8th Cir. 1982).

 The Court finds that Jihad has failed to establish that he has properly serve Srkypek.  Skrypek is a Catholic priest who formerly worked for the DOC.  (Skrypek Aff., Dkt. 149, at ¶ 1).  However, he retired from his position as religious coordinator at MCF-Stillwater in May of 2009.  (Id.)  Skrypek acknowledges that the Minnesota Attorney General's Office notified him that Jihad had named him as a defendant in the present action, but he has never been served with the summons or any complaint in this case, either in person or by mail.  (Id. at ¶ 2).

Jihad claims that he has affected service by leaving the summons and complaint at Skrypek's

former place of employment.  In support, Jihad cites Rule 4(e)(2)(B), which states that service can

be effected by leaving the summons and complaint "at the individual's dwelling or usual place of

abode with someone of suitable age and discretion who resides there."   This Rule is clearly

inapplicable and does not establish that service has been properly effected on Skrypek.  Nor is there

any basis for finding that Jihad has established service of process under any other rule of service.

See, Redding v. Hanlon, 2008 WL 762078 at *5-6 (D. Minn., Mar. 19, 2008)(describing the ways

that a plaintiff can serve an individual under the Federal Rules and Minnesota law).

While Skrypek is apparently aware of this lawsuit, actual notice of the lawsuit does not

establish personal jurisdiction if the defendant was not lawfully served.  Sieg v. Karnes, 693 F.2d

at 807.  To the extent that Jihad does not know Skyrpek's address, this does not relieve him of

serving Skrypek, which is a requirement that is grounded in principles of due process.  As such, the

Court finds that Jihad has failed to carry his burden of establishing that he properly served

Skrypek.[19]

Moreover, this lawsuit has been pending since June 24, 2009, and as such, Jihad's deadline

for serving Skrypek has long since expired.  See, Fed. R. Civ. Pro. 4(m)("If a defendant is not served

---

[19]     It appears that Jihad requested that Defendants provide Skrypek's address via discovery
requests served in mid-September.  Defendants objected on the grounds that the disclosure was
prohibited by State law.  Minn. Stat. §13.43, subd. 5a (2008)(providing that the home address and
telephone number of  DOC employees "shall not be disclosed to facility patients, corrections
inmates, or other individuals who facility or correction administrators reasonably believe will use
the information to harass, intimidate, or assault any of these employees").  The Court need not
address the validity of this objection, because, at this stage of the litigation, the Court finds that good
cause does not justify an extension of time to serve Skrypek.

within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time.")   While we might generally approach pro se cases somewhat indulgently, this does not excuse Jihad from complying with the Federal Rules of Civil Procedure, or other fundamental legal requirements, such as the duty to effect proper service of process. See, Redding, 2008 WL 762078 at *7 ("While pro se pleadings are to be construed liberally, we cannot ignore the requirement that a plaintiff effect proper service of process on a defendant"); Ackra Direct Marketing Corp. v. Fingerhut Corp., 86 F.3d 852, 856 (8th Cir. 1996)("In general, pro se representation does not excuse a party from complying with a court's orders and with the Federal Rules of Civil Procedure.").   In this case, the Court has been extremely indulgent, and Plaintiff has been afforded ample time to effect service of process.   There is no basis for concluding that Jihad has established good cause for an additional extension of time to serve Skrypek at this late stage of the litigation, particularly in light of the fact that Jihad's salat prayer claim – the **only** claim asserted against Skrypek – is without merit, as the Court has detailed.   Accordingly, the Court finds that Skrypek's Motion to Dismiss should be granted for the reasons stated above.

In response to the motion to dismiss, Jihad also filed a Motion to Strike Defendants' Motion to Dismiss.   The Motion to Strike is essentially his opposition to the Motion to Dismiss. Consequently, the Court similarly finds that Jihad's Motion to Strike should be denied as moot.[20]

---

[20]   On a final note, Defendants assert that Jihad has not served several documents that were filed earlier in this case.   Because these documents have not been dispositive to the Court's decision on the present motions, the Court will not address the issue any further.

**IV.     RECOMMENDATION**

Based on the foregoing and all of the files, records and proceedings herein, IT IS HEREBY

RECOMMENDED that:

1.      That Defendants' Motion to Dismiss [Docket No. 144] as to Blackmon be DENIED

as moot, and GRANTED as to Skrypek;

2.      Plaintiff's Motion to Strike [Docket No. 152] be DENIED;

3.      Plaintiff's Motion for Summary Judgment [Docket No. 131] be DENIED; and

4.      Defendant's Motion for Summary Judgment [Docket No. 162] be GRANTED in part

and denied in part:

a)      That all of Plaintiff's claims be DISMISSED with prejudice, with the

exception of Plaintiff's halal meals claim against Defendants Smith, Fabian, and Reishus;

b)      That all other claims against Defendants Crist, King, Miles, Julson, Skrypek,

and Blackmon be DISMISSED with prejudice.

DATED:  February 17, 2011

s/ _____
Leo. I. Brisbois
U.S. MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by March 3, 2011** a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof.  Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.